Donald H. CARLSON, Warren Hart, Gerard Haskins, Stephen R. Libby, Earl Weese, and Lyla C. Weese, Individually and as Class Representatives on behalf of All Persons Similarly Situated, Appellants,

v.

STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.

No. S-6590.

Supreme Court of Alaska.

June 21, 1996.

and Immunities Clause [2] of the United States Constitution. We reverse and remand.

Loren Domke, Loren Domke, P.C., Juneau, for Appellants.

Stephen M. White, Marie Sansone, Assistant Attorneys General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

COMPTON, Justice.

## I. INTRODUCTION

This is the second appeal from a class action challenging the State of Alaska's practice of charging nonresident commercial fishers licensing and limited entry permit fees which are three times greater than the fees charged resident commercial fishers. The class is comprised of "all persons who participated in one or more Alaska commercial fisheries at any time who paid non-resident assessments to the State for commercial or gear licenses or permits." *Carlson v. State*, 798 P.2d 1269, 1270 (Alaska 1990) (*Carlson I*). In this appeal the class challenges the superior court's grant of summary judgment to the State. The class contends that the superior court misinterpreted our mandate on remand and that the fee differential violates the Commerce Clause [1] and Privileges

## II. FACTS AND PROCEEDINGS

This appeal, like *Carlson I*, contests the constitutionality of AS 16.05.480, AS 16.43.160 and Alaska Administrative Code (AAC) 20.05.240.[3] Under AS 16.05.480 a resident pays $30 per year for a commercial fishing license, while a nonresident pays $90 per year for the same license. Similarly, under 20 AAC 5.240(a)(1)-(4) nonresidents pay three times more for limited entry permits. The fee for limited entry permits is determined by the value of the permit; [4] the fee range, for residents, is from $50 to $250.[5] *See* 20 AAC 5.240(a)(1)-(4).

In *Carlson I* the class alleged: (1) violations of the Privileges and Immunities Clause and Commerce Clause; and (2) the absence of State statutory authority to charge this type of fee differential prior to January 1983. We rejected the class's second contention that the statute did not authorize the 3:1 differential prior to 1983. *Carlson I*, 798 P.2d at 1278–79. However, as to the first issue we remanded the case and imposed on the State the burden of persuasion in defending the Commerce Clause and Privileges and Immunities challenges. *Id.* at 1274–78. With regard to the Privileges and Immunities Clause question we held:

Commercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause, and

1. The United States Constitution provides: "The Congress shall have power ... To regulate commerce with foreign nations, and among the several States and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

2. The Privileges and Immunities Clause of United States Constitution provides: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. Const. art. IV, § 2.

3. AS 16.43.160 is the authority under which the Commercial Fisheries Entry Commission (CFEC) adopted 20 AAC 5.240.

4. The profitability of the different fisheries, and hence the value of permits, varies dramatically. For example, the average gross earnings per permit for the Chignik salmon seine fishery ranged from $88,709 to $265,525 for the years

1983 through 1993. The permit fee for this fishery is $250 for residents and $750 for nonresidents. During the same time period the average gross earnings per permit for the Bristol Bay herring spawn on kelp fishery ranged from $847 to $1613. The permit fee for this fishery is $50 for residents and $150 for nonresidents.

5. The State notes that there is no evidence that this fee differential has discouraged nonresidents from participating in Alaska's commercial fisheries. During the period between 1982 and 1992 the participation of nonresidents in Alaska fisheries continued to increase. The State also emphasizes that virtually every state that has a commercial fishing industry has higher nonresident licensing and permitting fees. In many of these states the differential between resident and nonresident fees exceeds the one contested here.

license fees which discriminate against nonresidents are *prima facie* a violation of it. . . . Thus the questions here are whether the state has a substantial reason for the discrimination, and whether the 3:1 fee ratio bears a sufficiently close relationship to the goal.

*Carlson I*, 798 P.2d at 1274 (citations omitted). In imposing the burden of persuasion on the State on this issue we adopted the Wisconsin Supreme Court's analysis. *See Taylor v. Conta*, 106 Wis.2d 321, 316 N.W.2d 814, 823 n. 17 (1982). In doing so we held that "the burden of persuasion to demonstrate justification is properly on the state." [6] *Carlson I*, 798 P.2d at 1276.

We framed the issue on remand as, "whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contribution are taken into account." *Carlson I*, 798 P.2d at 1278. We also held that the revenues derived by the State from petroleum production are "analytically[ ] equivalent to 'taxes which only residents pay.'" *Carlson I*, 798 P.2d at 1278.

On remand the parties cross-moved for summary judgment, each proposing a different method by which to compare the fees being paid by nonresidents with the expenditures of state revenues to which the nonresidents make no contribution (the costs to residents). The class proposed what it termed the *per capita* formula. The *per capita* formula computes the contribution made by each resident to the cost of maintaining the commercial fisheries and compares this with the fee differential. The State proposed what it termed the *pro rata* formula. The *pro rata* formula in effect compares the total contributions made to the cost of commercial fisheries by residents to the total fees paid by nonresidents. The superior court concluded that under this method of analysis, residents paid by way of taxes (or their analytical equivalent) substantially more than nonresident fishers paid. In reaching this conclusion, the superior court applied the State's proposed formula to the categories of expenses accepted by us in *Carlson I*.[7] As the licensing and permitting fees charged nonresidents did not exceed the amount paid by residents, the superior court concluded that the differential did not violate either the Commerce Clause or the Privileges and Immunities Clause. The class appeals.

## III. DISCUSSION

### A. Standard of Review

Both parties correctly argue that the Commerce Clause and the Privileges and Immunities Clause challenges to AS 16.05.480, AS 16.43.160 and 20 AAC 5.240 present questions of constitutional law which we review *de novo*. *See Wright v. Black*, 856 P.2d 477, 479 (Alaska 1993). The issue of whether the superior court erred in adopting the *pro rata* formula to calculate the contribution to commercial fisheries management made by residents is also an issue of law which we review *de novo*. *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

---

6. We similarly imposed the burden of proof on the Commerce Clause challenge on the State. We held:

[O]nce a state law is shown to discriminate against interstate commerce "either on its face or in practical effect," the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means.

*Carlson I*, 798 P.2d at 1277 (quoting *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986)).

7. The State presented additional budget figures which included an analysis of every state agency for the years 1981 through 1993. The State claims that these figures included expenditures to which only Alaska residents contributed and which benefitted only commercial fishers. The class requested a stay and a reopening of discovery to address these new figures. The superior court determined that as it had not relied on the new figures in granting summary judgment, any dispute over these figures was moot. However, the court did reserve the right to reconsider this decision if this court determined that the class's *per capita* method should have been employed.

### B. The Challenged Fee Differential under the Commerce Clause

■ The class contends that two recent Supreme Court decisions require that the different fees charged to residents and non-residents under AS 16.05.480, AS 16.43.160 and 20 AAC 5.240 be analyzed under the Commerce Clause.[8] *See Oregon Waste Systems v. Dep't of Envtl. Quality,* 511 U.S. 93, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). The class argues that the fee differentials in these statutes and regulations violate the negative Commerce Clause.[9] The class argues AS 16.05.480, AS 16.43.160 and 20 AAC 5.240 are *per se* invalid under the Commerce Clause. A substantial portion of the class's briefs is devoted to analogizing the different commercial licensing and permit fees charged residents and nonresidents to surcharges the states of Oregon and Alabama imposed on out-of-state waste. The Supreme Court struck down these surcharges. *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1355; *Chemical Waste,* 504 U.S. at 334, 112 S.Ct. at 2009. The class contends that under the reasoning employed in *Oregon Waste Systems* and *Chemical Waste,* the 3:1 fee differential is tantamount to "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1350.

*Oregon Waste Systems* does not require that the fee differential challenged herein be evaluated under the Commerce Clause. In both *Oregon Waste Systems* and *Chemical Waste,* the Court found taxes imposed on out-of-state waste which were greater than the taxes imposed on in-state waste violated the negative Commerce Clause. In applying the negative Commerce Clause analysis in *Oregon Waste Systems,* the Court emphasized that the Commerce Clause prohibits states from unjustifiably discriminating against or burdening the interstate flow of *articles of commerce. Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1349. The Court went on to hold that "[i]t is well-established, however, that a law is discriminatory if it 'tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.'" *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1350 (quoting *Chemical Waste,* 504 U.S. at 342, 112 S.Ct. at 2013).

Unlike the fee differentials in *Oregon Waste Systems* and *Chemical Waste,* the fee differentials at issue in this case are not predicated upon the movement of articles of commerce across state lines, but rather upon the residency status of those applying for permits. The Supreme Court has consistently analyzed statutes which purportedly classify on the basis of residency under the Privileges and Immunities or the Equal Pro-

8. In *Carlson I* we left open the question of whether this case was governed by the Commerce Clause. We noted that earlier Supreme Court cases had suggested that the Commerce Clause does not apply to fish until the fish are actually harvested. *Carlson I,* 798 P.2d at 1276 n. 4 (citing *McCready v. Virginia,* 94 U.S. 391, 396, 24 L.Ed. 248 (1876); *Toomer v. Witsell,* 334 U.S. 385, 394–395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460, *reh'g denied,* 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1948)).

9. The grant of regulatory power to Congress implicit in the Commerce Clause has been interpreted to have a "negative" aspect "that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (citing *Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992)). A negative Commerce Clause analysis has two steps. First, the court must determine whether the challenged statute discriminates against interstate commerce or "regulates evenhandedly with only 'incidental' effects on interstate commerce." *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1350 (citations omitted). Second, "[i]f the restriction is discriminatory—*i.e.,* favors in-state economic interests over their out-of-state counterparts—it is virtually *per se* invalid." *Id.* at ——, 114 S.Ct. at 1347. A restriction found to be *per se* invalid must be struck down unless the state can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at ——, 114 S.Ct. at 1351 (citations omitted). The justifications for a discriminatory tax or restriction must pass the strictest scrutiny. *Id.* at ——, 114 S.Ct. at 1351. However, if the restriction is nondiscriminatory it is valid unless the burden it imposes on interstate commerce "is clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

tection Clauses.[10] In *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), the Court evaluated South Carolina shrimping license fees, which were one hundred times greater for non-residents than for residents, under the Privileges and Immunities Clause. There the Court observed that the Privileges and Immunities Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."[11] *Toomer*, 334 U.S. at 395, 68 S.Ct. at 1162.

### C. The Challenged Fee Differential under the Privileges and Immunities Clause

■■■ The class contends also that the nonresident fee differential violates the Privileges and Immunities Clause of the United States Constitution. The Privileges and Immunities Clause is not absolute. "[I]t does not preclude disparity of treatment [of citizens of other states] in the many situations where there are perfectly valid independent reasons for it." *Toomer*, 334 U.S. at 396, 68 S.Ct. at 1162. A claim that a residency classification violates the Privileges and Immunities Clause requires a two-step inquiry:

First, the activity in question must be sufficiently basic to the livelihood of the Nation ... as to fall within the purview of the Privileges and Immunities Clause....

Second, if the challenged restriction deprives nonresidents of a protected privilege, we will invalidate it only if we conclude that the restriction is not closely

related to the advancement of a substantial state interest.

*Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64–65, 108 S.Ct. 2260, 2264, 101 L.Ed.2d 56 (1988) (internal quotations and citations omitted).

We determined in *Carlson I* that commercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause. 798 P.2d at 1274. However, the class claims that for us to find for the State on the relatedness prong of the inquiry, the State "must demonstrate that behind the nonresident surcharge or differential is a[sic] (1) substantial reason advancing a legitimate State policy and (2) the means employed by the statutory scheme must be closely tailored and have a substantial relationship to a legitimate interest served by the statute." Appellant's Brief at 27.

We have already made the first inquiry. In *Carlson I*, we held that equalizing the burden of fisheries management, "where residents pay proportionately more in foregone benefits than nonresidents for fisheries management," was a substantial State interest. *Id.* at 1278. However, we concluded that the record did not contain sufficient evidence to determine whether the differential in fees charged residents and nonresidents was sufficiently related to this interest to justify such disparate treatment. *Id.* at 1278.

The class questions the relatedness of the fee differential to the burden of fisheries management borne by residents. It analo-

---

**10.** *See United Bldg. & Const. v. Mayor & Council of Camden*, 465 U.S. 208, 215–19, 104 S.Ct. 1020, 1026–28, 79 L.Ed.2d 249 (1984) (analyzing a municipal resident hiring preference under the Privileges and Immunities Clause); *Hicklin v. Orbeck*, 437 U.S. 518, 524, 98 S.Ct. 2482, 2486–87, 57 L.Ed.2d 397 (1978) (evaluating under the Privileges and Immunities Clause the Alaska Hire Law which preferenced Alaska residents in hiring); *Sosna v. Iowa*, 419 U.S. 393, 406, 95 S.Ct. 553, 560–61, 42 L.Ed.2d 532 (1975) (reviewing Iowa's durational residency requirement for divorces under the Privileges and Immunities Clause); *see also Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978) (stating that the Privileges and Immunities Clause "has been interpreted to prevent a State from imposing unreasonable burdens on Citizens of other States

in their pursuit of common callings within the State" (citations omitted)).

**11.** In *Anderson v. Mullaney*, 191 F.2d 123 (9th Cir.1951), *aff'd* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), the Ninth Circuit struck down on Commerce Clause grounds an Alaska territorial statute which charged non-resident fishermen a higher license fee than resident fishermen. On certiorari the Supreme Court affirmed on Privileges and Immunities rather than Commerce Clause grounds, following *Toomer v. Witsell*. Assuming that the Commerce Clause would also apply to cases of this nature, it is difficult to believe that a license fee differential which passes muster under the Privileges and Immunities analysis would nonetheless be an unconstitutional discrimination against interstate commerce.

gizes this case to other Supreme Court cases, and challenges our conclusion in *Carlson I* that petroleum revenues are the analytical equivalent of taxes. The class argues that *Oregon Waste Systems* prohibits the State from arguing that the fee differentials do not discriminate against nonresidents because they merely impose on nonresidents their share of the costs of fisheries management. It claims that under the reasoning of *Oregon Waste Systems,* neither general tax revenues nor oil royalty revenues can be viewed as the residents' contributions to fisheries management.[12]

There are two flaws with the class's argument. First, *Oregon Waste Systems* was a Commerce Clause case. *See Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1349. Although the reasoning in Privileges and Immunities Clause cases has been used in Commerce Clause cases, it is not analytically sensible to do the reverse in this case. In this case the Privileges and Immunities Clause question turns on whether there is a sufficient relationship between the higher fees charged nonresidents and the State's interest in imposing on nonresidents their share of the costs for managing the State's commercial fisheries. In *Oregon Waste Systems,* the issue was whether the interstate and intrastate taxes are imposed on sufficiently equivalent events such that they could be considered proxies for each other. *See Id.* at —— – ——, 114 S.Ct. at 1352–53. These are different inquires for which the analysis is not interchangeable.[13]

Second, the class's argument demonstrates a lack of understanding of our holding in *Carlson I.* Contrary to the class's contentions, we did not advocate the kind of fee-shifting denounced by the Supreme Court in *Oregon Waste Systems.* In *Carlson I* we did not advance a compensatory tax doctrine which would impose on nonresidents their

entire share of the costs of commercial fisheries management, while resident fishers' share of these costs was borne by the entire population of the State. Rather, we held that the issue is

> whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contribution are taken into account.

*Carlson I,* 798 P.2d at 1278. The disparate fees charged to nonresidents will not offend the Privileges and Immunities Clause if the differential does not exceed the contribution made by residents, because the differential will be justified as imposing on nonresidents their share of the costs of commercial fisheries. The fee differential merely balances out "any conservation expenditures from taxes which only residents pay." *Toomer,* 334 U.S. at 399, 68 S.Ct. at 1163.[14] In *Carlson I* we held that the State bore the burden of persuasion on this issue. 798 P.2d at 1276. This burden should be met by calculating the contribution made by residents and comparing it with the challenged fee differentials.

D. *The State's Pro Rata Method of Calculating the Amount Residents Contribute to Fisheries Management*

To establish "practical equality" between residents and nonresidents, the State must demonstrate that the higher fees charged nonresidents are equivalent to the burden borne by residents as measured by the "residents' *pro rata* shares of state revenues to which nonresidents make no contribution." *Carlson I,* 798 P.2d at 1278. The *per capita* formula propounded by the class is the correct method for calculating the contribution made by residents.

---

**12.** The class calls this its "attribution of tax revenues" argument.

**13.** Additionally, the Supreme Court in *Oregon Waste Systems* had reasons other than the disparity between the events being taxed for finding that the Department of Environmental Quality's compensatory tax argument was disingenuous. For example, the Court expressed concern over the fact that the out-of-state surcharge was actu-

ally assessed on in-state shippers who already paid Oregon income taxes, the very tax the surcharge supposedly balanced out. *See Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1353.

**14.** In *Oregon Waste Systems,* the Court gave no indication that it intended to cast doubt on this aspect of *Toomer.*

Under the *per capita* formula the resident contribution is calculated in the following manner: (Fisheries Budget/Alaska Population) X (percentage of State Budget from oil revenues/1.0). *See Appendix A.* Once this computation is made the resident contribution can be compared to the difference in fees paid by nonresidents to determine if the fee differential is constitutional.

The State advocates a different formula for computing the resident contribution. The State's formula utilizes a three-step approach. The State would (1) calculate the expenditures or costs of the commercial fisheries (enforcement and conservation); (2) determine the resident and nonresident commercial fishers' respective *pro rata* shares of those expenditures; and (3) compare the percentage of its respective *pro rata* share each group is paying. *See Appendix A.*

The State's formula differs from the class's when it comes to deciding how to determine the numbers to be used in steps two and three. Although the formulae are theoretically different and are calculating different quantities, the significant difference between the two proposed formulae concerns how the residents' *pro rata* share is calculated. As discussed above, the class argues that the amount used as the divisor of the commercial fisheries expenditures from taxes which only residents pay must be the total number of Alaskans. It correctly asserts that using this number will allow the court to determine the *per capita* contribution actually being made by each of the resident permit holders. On the other hand, the State argues that the holdings in *Toomer* and *Carlson I* mandate that the residents' contribution should be determined by dividing the fisheries' expenditures from taxes by the number of resident permits issued in any given year.[15] The State is wrong. As stated above, in *Carlson I* we held that the relevant inquiry was "whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contribution are taken into account." *Carlson I*, 798 P.2d at 1278. Thus, we ordered the superior court to compare the relative burden placed on resident and nonresident commercial fishers. The *per capita* method does just this. Had *Carlson I* mandated a comparison of the expenditures made by the State to the contribution made by nonresident fishers, the State's theory would be correct.[16] Resident commercial fishers are paying the license and permit fees they are charged plus their *per capita* share of oil revenues which are diverted to fisheries management from other benefits or State services. It is this quantity which must be equivalent to the fee differential for the fees to be constitutional under the *Carlson I* analysis. *See Carlson I*, 798 P.2d at 1278.[17]

**15.** This is not exactly accurate because the State's formula never calculates the actual amount that each individual resident is purported to contribute. Rather, the State's formula calculates the percentages of their fair share of costs residents and nonresidents pay.

**16.** However, this would be just the kind of compensatory tax rationale which the Supreme Court struck down in *Oregon Waste Systems.*

**17.** The State also argues that the *per capita* formula should be rejected because it has never been used by any court in any context. The State cites a string of equal protection cases to support this assertion. *See Baldwin*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978); *LCM Enterprises, Inc. v. Town of Dartmouth*, 14 F.3d 675 (1st Cir.1994); *Johns v. Redeker*, 406 F.2d 878 (8th Cir.1969). However, these equal protection cases have no bearing on the suitability of the *per capita* approach in this case. In *Baldwin* the comparison being made was between the state's costs for maintenance of the big-game populations, not the contributions made by resident big-game hunters to the maintenance of big-game populations. *Baldwin*, 436 U.S. at 389, 98 S.Ct. at 1863. Additionally, in *Baldwin* the calculations were being viewed under the rational basis test, a more lenient standard than the intermediate scrutiny required in this case. *Baldwin*, 436 U.S. at 390–91, 98 S.Ct. at 1864. Similarly, *LCM Enterprises* is inapplicable because it too involved the application of the rational basis test, which only requires that the classification being challenged is rationally related to the legitimate state interest. *LCM Enterprises*, 14 F.3d at 679. *Johns* also has no relevance to the issue at hand because the court in *Johns* does not discuss the method the trial court used to determine the resident contribution which was being compared with the higher fees charged to nonresidents. *Johns*, 406 F.2d at 883.

As we have concluded that the resident contribution must be calculated using the class's *per capita* formula, we remand the case for the application of this formula. If under the formula the fee differential exceeds the resident contribution, the State will have failed to demonstrate that the means employed by its statute have a substantial enough relationship to the legitimate interest of the statute to survive Privileges and Immunities Clause review. Conversely, if the superior court finds that the fee differential is not greater than the resident contribution, the State has successfully carried its burden of proving that the means employed by its statutory scheme are substantially related to the legitimate interest served by the statute. On remand the superior court shall address issues relating to the additional budget figures presented by the State. It will need to determine whether to accept these new figures and decide whether it should grant a stay and reopen discovery in order to allow the class to respond to the State's presentation of these new figures.

E. *Prejudgment Interest of the Unlawful Portion of the License Fees from the Date the Class Action Was Filed*

The class seeks a refund under AS 43.10.210,[18] of all unlawfully exacted fees from the date of filing the lawsuit with statutory prejudgment interest calculated under AS 45.45.010. In *Carlson I* we held that AS 43.15.010 would govern any refund in this case, and that if the class succeeded on its constitutional claims it could only recover unlawfully collected fees if it could satisfy the protest requirement of AS 43.15.010. 798 P.2d at 1279–80. We remanded for further findings on whether the State had waived the protest requirement, thereby allowing a refund of all fees not barred by the statute of limitations. *Id.* The superior court found that the State had not waived the protest requirement.

The class admits that it could not have satisfied the protest requirement for the taxes paid prior to the filing of the lawsuit, and thus does not seek a refund of any unlawfully assessed fees paid prior to June 22, 1984. However, the class claims that the filing of the complaint in the case at bar fulfills the protest requirement.

Although the State does not address this issue in its brief, the record indicates that the State agrees that those fees which were paid after June 22, 1984, were paid under protest sufficient to permit a refund under AS 43.10.210. This does not mean that the State concedes that any refund would be due if the class succeeds. The State argued below that it only had conceded that the protest requirement of AS 43.10.210 had been met, and that this "is merely one precondition to the '[r]ecovery of overpayments and protested payments.'" Because the State does not brief this issue, it is impossible to know whether it would still make this argument.

If on remand the superior court determines that the class has prevailed, the superior court must also decide whether the filing of this suit constituted notice sufficient to comply with the protest requirement of AS 43.10.210(a), and whether prejudgment interest is due under AS 45.45.010.

IV. *CONCLUSION*

We conclude that this appeal does not implicate the Commerce Clause. We REVERSE the superior court's approval of the State's *pro rata* formula of calculating and comparing the taxation burden placed on resident and nonresident commercial fishers, and we REMAND for application of the class's *per capita* formula. We also order that on remand the superior court address the unresolved issues concerning the appropriate budget items to be considered in determining the State's expenditures (*i.e.*, resident contributions). Additionally, if the superior court finds for the class, it must determine the date from which the class

---

18. AS 43.15.010 was renumbered 43.10.210. AS 43.10.210(a) provides:
 The Department of Administration shall, with the approval of the attorney general and the Department of Revenue, refund to a taxpayer the amount of a tax paid to the Department of

Revenue under protest and deposited in the treasury if
 (1) the taxpayer recovers judgment against the Department of Revenue for the return of the tax. . . .

should be given a refund, and what, if any, interest is due on that refund.

| | | |
|---|---|---|
| 1982: | $29,000,000 / 500,000 [19] × 83% = | $48.14 |
| 1983: | $31,000,000 / 500,000 × 81% = | $50.22 |
| 1984: | $34,000,000 / 500,000 × 82% = | $55.76 |
| 1985: | $34,800,000 / 500,000 × 82% = | $57.07 |
| 1986: | $34,500,000 / 500,000 × 86% = | $59.34 |
| 1987: | $29,600,000 / 500,000 × 76% = | $44.99 |
| 1988: | $29,300,000 / 500,000 × 83% = | $48.64 |
| 1989: | $29,900,000 / 500,000 × 82% = | $49.04 |

## APPENDIX

The following is a comparison of the two proposed formulae which uses the statistics proffered by the State for the years 1982 through 1989. It is difficult to compare the State's and class's formulae because they calculate and compare different quantities in an attempt to measure what residents and nonresidents are paying. The class's formula calculates the fee differential which would be allowable, while the State's formula computes the respective percentages of costs of running the commercial fisheries which residents and nonresidents could pay and still be "treated similarly."

### A. Application of the Class's Per Capita Formula

The class's *per capita* formula: Fisheries Budget/Alaska Population × Percentage State Budget from Oil Revenues.

Under the *per capita* formula the allowable fee differential will vary from year to year. For example, in 1982 the difference between a resident and nonresident permit could not substantially exceed $48.14, while in 1986 the difference could not substantially exceed $59.34.

### B. Application of the State's Pro Rata Formula

The State's formula calls for the comparison of two calculations: (1) Fair Share of Resident Costs = (Residents' Pro Rata Share [20]) × (Fisheries Budget × Percentage of State Revenue from Oil); and (2) Fair Share Nonresident Costs = (Nonresidents' Pro Rata Share [21]) × (Fisheries Budget × Percentage of State Revenue from Oil).

The following two tables are the application of these formulae.

*Percentage of State's Commercial Fishery Expenditures Paid By Residents:*

| Fiscal Year | Column 1 % of Limited Entry Permits Held By Residents | Column 2 Total Expenditures By Four Agencies For Commercial Fishery Management | Column 3 Residents' Pro Rata Share of Total Expenditures | Column 4 % of the Total State Revenues To Which Nonresidents Make No Contribution | Column 5 Residents' Pro Rata Share of Expenditures From Revenues To Which Nonresidents Make No Contribution | Column 6 Residents' Fees Paid For Licenses and Permits | Column 7 Total Amount Paid By Residents To Participate in Commercial Fisheries | Column 8 % Paid By Residents of Their Pro Rata Share of State Expenditures For Commercial Fisheries |
|---|---|---|---|---|---|---|---|---|
| 1982 | 83% | $29.0 | $24.1 | 83% | $20 | 1.3 | $21.3 | 88% |
| 1983 | 84% | $31.0 | $26.0 | 81% | $21.1 | 1.3 | $22.4 | 86% |
| 1984 | 85% | $34.0 | $28.9 | 82% | $23.7 | 1.2 | $24.9 | 86% |
| 1985 | 84% | $34.8 | $29.2 | 82% | $23.9 | 1.5 | $25.4 | 87% |
| 1986 | 84% | $34.5 | $29.0 | 86% | $24.9 | 1.5 | $26.4 | 91% |
| 1987 | 82% | $29.6 | $24.3 | 76% | $18.5 | 1.7 | $20.2 | 83% |
| 1988 | 82% | $29.3 | $24.0 | 83% | $19.9 | 2.0 | $21.9 | 91% |
| 1989 | 82% | $29.9 | $24.5 | 82% | $20.1 | 2.0 | $22.1 | 90% |

19. For the purpose of this example we will assume that the population of Alaska is 500,000.

20. Residents' Pro Rata Share: (Percentage of Permits Held by Residents) × (Fisheries Budget).

21. Nonresidents' Pro Rata Share: (Percentage of Permits Held by Nonresidents) × (Fisheries Budget).

*Percentage of State's Commercial Fishery Expenditures Paid by Nonresidents:*

| Year | Column 1<br>% of Limited Entry Permits Held By Nonresidents | Column 2<br>Total Expenditures By Four Agencies For Commercial Fishery Management | Column 3<br>Nonresidents' Pro Rata Share of Total Expenditures | Column 4<br>Nonresidents' Fees Paid For Licenses and Permits | Column 5<br>% Paid By Nonresidents of Their Pro Rata Share of State Expenditures For Commercial Fisheries |
|------|------|------|------|------|------|
| 1982 | 17% | $29.0 | $4.9 | $1.3 | 27% |
| 1983 | 16% | $31.0 | $5.0 | $1.2 | 24% |
| 1984 | 15%. | $34.0 | $5.1 | $1.0 | 20% |
| 1985 | 16% | $34.8 | $5.6 | $1.2 | 21% |
| 1986 | 16% | $34.5 | $5.5 | $1.3 | 24% |
| 1987 | 18% | $29.6 | $5.3 | $1.6 | 30% |
| 1988 | 18% | $29.3 | $5.3 | $2.3 | 43% |
| 1989 | 18% | $29.9 | $5.4 | $2.2 | 41% |

Under the *pro rata* formula the differential is constitutional as long as the percentage of fair costs nonresidents are paying does not exceed the percentage of fair costs that residents are paying. Thus, the fee differential was constitutional in 1983 because residents paid 86% of their share and nonresidents only paid 24% of their share. As stated in the text of the opinion, the flaw with this formula is that it treats the resident fishers as if they alone are paying the tax equivalent (percentage of revenues to which nonresidents make no contribution). For this formula to accurately calculate the resident fishers' contribution, it would need to divide the residents' *pro rata* fair share by the population of Alaska and then multiply by the number of resident fishers.

RABINOWITZ, Justice, dissenting.

The majority concludes that since *Oregon Waste Systems v. Department of Environmental Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994), was decided under the Commerce Clause as opposed to the Privileges and Immunities Clause, its reasoning is inapposite here. I cannot agree.

The United States Supreme Court has long acknowledged "the mutually reinforcing relationship between the Privileges and Immunities Clause of Art. IV, § 2, and the Commerce Clause—a relationship that stems from their common origin in the Fourth Article of the Articles of Confederation and their shared vision of federalism...." *Hicklin v. Orbeck*, 437 U.S. 518, 531–32, 98 S.Ct. 2482, 2490, 57 L.Ed.2d 397 (1978). It has, in fact, endorsed the methodology of referring to Commerce Clause precedent in deciding claims based solely on the Privileges and Immunities Clause. *Id.* See also *Sestric v. Clark*, 765 F.2d 655, 664 (7th Cir.1985) ("The two clauses are part of the same document, drafted by very intelligent and careful men; why would they have wanted the same discrimination against nonresidents to be tested by a different standard, depending on which clause was cited in the complaint?").

I do not mean to suggest that the two clauses are completely interchangeable. The differences between them, however, appear to primarily involve matters of scope as opposed to content. For example, the market regulator—market participant doctrine can shield a state from Commerce Clause attack but not from a claim based on the Privileges and Immunities Clause. *United Bldg. & Constr. Trades Council v. Mayor*, 465 U.S. 208, 221–22, 104 S.Ct. 1020, 1029, 79 L.Ed.2d 249 (1984). On the other side of the equation, the Commerce Clause protects corporations, while the Privileges and Immunities Clause does not. *Paul v. Virginia*, 75 U.S. (8 Wall) 168, 19 L.Ed. 357 (1869).

In this way discrimination predicated somehow on state affiliation can fall within the scope of the Privileges and Immunities Clause alone, the Commerce Clause alone, both clauses, or, for that matter, neither.[1] Once it has been determined that a discriminatory policy falls within the purview of one or both of these clauses, however, I am not persuaded that the methodology of the two should diverge in any significant respect. The extent to which the interpretation of these two clauses has historically been interwoven confirms this assessment.

Further, the level of scrutiny triggered by a discriminatory policy that falls within the scope of either of these clauses appears to be very nearly identical. Professor Tribe has observed that the standard of review employed in Privileges and Immunities cases is "almost as demanding as that elaborated by the Warren Court in equal protection and first amendment strict scrutiny." [2] Similarly, in *Oregon Waste Systems,* the Supreme Court observed that Commerce Clause cases "require that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.'" *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1351. Under both clauses, the burden is placed on the state to provide a sufficient justification for its discriminatory policy.

Considering the significant similarities between the two clauses, it not surprising that in *Carlson I* we simply referenced our Privileges and Immunities Clause analysis in order to dispose of the Commerce Clause issue, concluding that "[t]he analysis under Article I, section 8, clause 3 of the United States Constitution (the Commerce Clause) is quite similar, assuming that it is implicated."

*Carlson I,* 798 P.2d at 1276. Indeed, we went on to state that "[i]t would be anomalous ... to conclude that a law facially discriminating against interstate commerce could pass muster under the Privilege and Immunities Clause yet fail under the Commerce Clause; both clauses have a common origin in the fourth article of the Articles of Confederation." *Id.* at 1277 n. 5. In the wake of the United States Supreme Court's ruling in *Oregon Waste Systems,* however, the majority has reconsidered this position and concluded that, in fact, "the analysis is not interchangeable."

It is obvious that the fee discrepancy in this case implicates the Privileges and Immunities Clause. The policy is facially discriminatory, and it impairs an interest that is "fundamental" for purposes of Privileges and Immunities Clause analysis. Given the exceptionally close relationship between this clause and the Commerce Clause, I cannot, as noted above, join in the majority's summary rejection of the United States Supreme Court's reasoning in *Oregon Waste Systems.*

The justification offered by Oregon for discriminating against out-of-state interests in *Oregon Waste Systems* is very similar, if not identical, to the justification advanced by the State in the case at bar. The primary rationale is that out-of-state interests ought to be made to bear their "fair share" of the costs that their activities impose on the state. *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1351; *Carlson I,* 798 P.2d at 1272. In both cases, the "share" or contribution of in-state interests is augmented by general state tax revenues, or their analytical equivalent, in order to justify the tax or fee discrepancies.[3]

---

**1.** A well-recognized example of this last category would be a policy of discriminating against non-residents in the granting of recreational game or fishing license fees. This kind of state discrimination does not implicate the Commerce Clause since it does not significantly burden interstate commerce, and it does not implicate the Privileges and Immunities Clause because it does not involve a fundamental right. *See, e.g., Baldwin v. Fish and Game Comm'n of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).

**2.** Lawrence H. Tribe, *American Constitutional Law* § 6–35, at 544 (2d ed.1988).

**3.** Although the majority asserts that the fee-shifting we authorized in *Carlson I* is not the same kind of fee-shifting denounced by the Supreme Court in *Oregon Waste Systems,* I think that the similarities between the two far outweigh any potential differences. The approach authorized by the majority seems to place greater emphasis on the theoretical equality of individual contributions than the Oregon tax did. There is, however, no indication that the Oregon tax was designed to impose on out-of-state interests their "entire share" of solid waste disposal costs nor, for that matter, that the shares of disposers of in-state waste, who paid an $0.85 per ton fee, were to be borne by the entire population. More

In *Carlson I,* we concluded that this kind of augmentation was acceptable under the holding of *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). In *Toomer,* the Supreme Court stated, in dicta, that a state could "charge non-residents a differential which would merely compensate the State ... for any conservation expenditures from taxes which only residents pay." *Id.* at 399, 68 S.Ct. at 1163. The Supreme Court in *Oregon Waste Systems,* however, expressing its reluctance to "plunge ... into the morass of weighing comparative tax burdens by comparing taxes on dissimilar events[,]" explicitly rejected this type of justification for state discrimination in the Commerce Clause context. *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1353 (citations and internal quotation marks omitted).

The majority correctly observes that the compensatory tax doctrine, focusing on whether or not the taxes which allegedly cancel each other out are imposed on "substantially equivalent events," finds its origins in Commerce Clause cases. It does not follow from this observation, however, that the doctrine has no place in Privileges and Immunities analysis. There is nothing inherent in this doctrine, or the policy concerns behind it, that indicates that it should only apply to discriminatory state taxation challenged under the Commerce Clause.

In *Armco, Inc. v. Hardesty,* 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), the Supreme Court struck down a discriminatory tax on the grounds that "manufacturing and wholesaling are not 'substantially equivalent events'" on which compensating taxes might be imposed. *Id.* at 643, 104 S.Ct. at 2623. In that case, West Virginia had imposed a wholesale gross receipts tax from which local manufacturers were exempt. The policy underlying the exemption was that it would put in-state manufacturers who were wholesaling their products in West Virginia on equal footing with their out-of-state competitors who were functionally exempt from West Virginia's manufacturing tax.[4] The Court rejected this justification, observing that

[i]f Ohio or any of the other 48 States imposes a like tax on its manufacturers—which they have every right to do—then Armco and others from out of state will pay both a manufacturing tax and a wholesale tax while sellers resident in West Virginia will pay only the manufacturing tax.

*Id.* at 644, 104 S.Ct. at 2623.

Likewise, the Supreme Court in *Oregon Waste Systems* observed that Oregon's compensatory tax theory "ignore[s] the fact that shippers of waste from other States in all likelihood pay income taxes in other States, a portion of which might well be used to pay for waste reduction activities in those States." *Oregon Waste Systems,* 511 U.S. at —— n. 7, 114 S.Ct. at 1353 n. 7.

In this respect the "substantially equivalent events" test essentially serves to identify a significant logical flaw that often infects "fair share" justifications for discriminatory taxes. I can see no reason to assume that this flaw is any less serious when it is exposed through litigation based upon the Privileges and Immunities Clause than it is when challenged under the Commerce Clause.[5]

---

importantly, the decision in *Oregon Waste Systems* did not turn on the fact that the surcharge was excessive but rather on the conclusion that any surcharge was constitutionally offensive under the circumstances. Consequently, the majority's endorsement of the class's *per capita* approach does not sufficiently distinguish the fee discrepancies here from those in *Oregon Waste Systems.*

4. Presumably the only reason that the Privileges and Immunities Clause was not invoked in this case—where it would seem to be a natural choice—is that the plaintiff was a corporation not entitled to protection under that clause. As such, the *Armco* case provides an excellent example of how the "substantially equivalent events"

test should apply with equal force regardless of which clause is invoked.

5. A commentator has observed:
While differences exist between the purposes and functions of the two constitutional clauses, they clearly exert overlapping spheres of influence. To hold the same tax invalid under one clause because it does not meet the substantially equivalent events requirement of the compensatory tax test, but valid under the other clause because it is important ... that a state have power to preserve and regulate the exploitation of an important resource through means of a functionally compensatory tax, is surely to elevate form over substance.
Jeffrey J. Lamontagne, Note, *Oregon's Wasted Effort: The Supreme Court's Inability to Adapt its*

The justification advanced by the State in this case suffers from precisely the same defect alluded to in both *Armco* and *Oregon Waste Systems*. Specifically, a fisher from Oregon who purchases a commercial license in Alaska will no doubt be under an obligation to pay Oregon income taxes, a portion of which probably will have been used for conservation costs in that state. Accordingly, the fee discrepancy places the Oregon fisher, as a nonresident, at a competitive disadvantage. In other words, both the Alaska fisher and the Oregon fisher are obliged to contribute to a general tax fund [6] from which their respective States may draw monies to support local fisheries, but only the Oregon fisher is being called upon to pay enhanced fees.

Restating our holding in *Carlson I*, the majority concludes that "[t]he disparate fees charged to nonresidents will not offend the Privileges and Immunities Clause if the differential does not exceed the contribution made by residents, because the differential will be justified as imposing on nonresidents their share of the costs of commercial fisheries." Implicit in this analysis is that a share of this state's petroleum revenues, the analytical equivalent to general tax revenues, should be attributed to the resident fishers in calculating their contribution. Since I believe that the United States Supreme Court's holding in *Oregon Waste Systems* effectively forecloses this method of justifying a discriminatory tax, I cannot agree.

On the basis of the Supreme Court's reasoning in *Oregon Waste Systems,* I conclude that the fee discrepancies authorized by AS 16.05.480, AS 16.43.160 and 20 AAC 05.240 violate the Privileges and Immunities Clause of the Constitution of the United States of America.

*Compensatory Tax Doctrine to Solid Waste Regulations,* 19 Wm. & Mary Envtl. L. & Pol'y Rev. 345, 360 (1995) (citations and internal quotation marks omitted).

6. The Alaskan fisher "contributes" in the form of foregone benefits from petroleum revenues.