STATE of Alaska, COMMERCIAL
FISHERIES ENTRY COM-
MISSION, Appellant,

v.

Donald H. CARLSON, Warren Hart, Ger-
ard Haskins, Stephen R. Libby, Earl
Weese, and Lyla C. Weese, Individually
and as Class Representatives on Behalf
of All Persons Similarly Situated, Appel-
lees.

No. S–11677.

Supreme Court of Alaska.

April 11, 2008.

Rehearing Denied Sept. 11, 2008.

Robert C. Nauheim, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellant.

Loren Domke, Juneau, for Appellees.

Before: MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

To what extent may Alaska charge nonresident commercial fishermen higher license and permit fees than it charges residents? In order to comply with the Privileges and Immunities Clause of the United States Con-

stitution, the differential between individual resident and nonresident permit fees must be substantially equal—but need not be precisely equal—to the contribution of each Alaska resident to fisheries management. Because in ordering the state to pay refunds to nonresidents who paid more than their fair contribution to Alaska's fisheries budget the superior court held the state to a standard of precise, rather than substantial, equality, we vacate the portion of the superior court's order pertaining to refunds and remand the case to the superior court to determine the legitimate variation between actual nonresident fee differentials and those calculated to reflect nonresidents' fair burden of fisheries management costs.

## II. FACTS AND PROCEEDINGS

This is the fourth time this case has been before us. In 1984 appellees sued the state and the Commercial Fisheries Entry Commission (CFEC) on behalf of all nonresident Alaska commercial fishermen. (The class includes "all persons who participated in one or more Alaska commercial fisheries at any time who paid non-resident assessments to the State for commercial or gear licenses or permits."[1]) The class argued that the state unfairly charged nonresidents more than it charged residents for commercial fishing permits and licenses, and the class demanded a refund of the difference between what they paid and what the residents paid. Between 1984 and 2002 nonresident commercial fishermen paid three times as much as resident fishermen for licenses and permits.[2] A brief

---

1. *Carlson v. State, Commercial Fisheries Entry Comm'n*, 798 P.2d 1269, 1270 (Alaska 1990) (*Carlson I*).

2. From 1977 to 2001 AS 16.43.160(b) stated:
   Annual fees established under this section shall be no less than $10 and no more than $750 and shall reasonably reflect the different rates of economic return for different fisheries. *The amount of an annual fee for a nonresident shall be three times the amount of the annual fee for a resident.*
   (Emphasis added.)
   The legislature repealed this section in 2001 and added a new section on nonresident fees. Ch. 27, §§ 5, 7, SLA 2001. Effective 2002, nonresident fees were covered by AS 16.43.160(e):
   For an entry permit or an interim-use permit issued for calendar year 2002 and following

years, the annual base fee may not be less than $10 or more than $300. The annual base fee must reasonably reflect the different rates of economic return for different fisheries. *The fee for a nonresident entry permit or a nonresident interim-use permit shall be higher than the annual base fee by an amount, established by the commission by regulation, that is as close as is practicable to the maximum allowed by law.* The amount of the fee for a nonresident entry permit or a nonresident interim-use permit may reflect [various costs associated with fisheries management].
   Ch. 27, § 5, SLA 2001 (emphasis added).
   In 2005 the statute was amended to provide:
   In addition to the annual base fee established by the commission under this subsection, a nonresident shall pay an annual nonresident

summary of our previous rulings in this case follows.

In *Carlson I*,[3] which involved a scheme under which a nonresident paid three times as much as a resident for a commercial fishing permit, we held that the Privileges and Immunities Clause of the United States Constitution[4] requires "substantial equality" of treatment of residents of Alaska and similarly situated nonresidents.[5] Therefore, "license fees which discriminate against nonresidents are prima facie a violation" of the clause.[6] However, when setting nonresident fees, the state may take into account residents' pro rata shares of state revenues to which nonresidents make no contribution.[7] Thus, the state may legally charge nonresidents more than residents as long as the fee differential bears a sufficiently close relationship to the goal of equalizing the economic burden of fisheries management between residents and nonresidents.[8] On the relatively undeveloped record before us in *Carlson I* we declined to determine whether the higher fees were excessive and remanded the case to the superior court for further proceedings; we indicated that the class would be entitled to a refund unless the state could carry its burden of showing that there was a "fairly precise fit between remedy and classification."[9] On remand, the superior court

ruled that the fee differential did not violate either the Commerce Clause[10] or the Privileges and Immunities Clause, and the class appealed.[11]

In *Carlson II* we determined the permissible differential between fees paid by residents and nonresidents under the Privileges and Immunities Clause.[12] We found this permissible differential to be the total of the state fisheries budget divided by the number of Alaska residents, multiplied by the percentage of the state budget funded by Alaska oil revenue.[13] We remanded the case to the superior court to apply this formula and to consider additional budget figures put forward by the state.[14] In the midst of the proceedings on remand from *Carlson II*, the parties signed a stipulation on February 12, 2001 establishing terms for payment of any refunds and the method for calculating nonresident fees in the future. The stipulation was adopted by the superior court. The parties also agreed to adopt a "per-person approach" to calculating the permissible differential: only one differential would be charged or assessed against a person, no matter how many permits the person held. Additionally, the state waived any right to seek recapture of the differential from any fisher who historically had paid less than the permissible differential.

surcharge for the issuance or renewal of one or more entry permits or interim-use permits. The annual nonresident surcharge shall be established by the commission by regulation at an amount that is as close as is practicable to the maximum allowed by law.
AS 16.43.160(c) (Temporary and Special Acts and Resolves 2005); Ch. 16, § 3, SLA 2005.

3. 798 P.2d at 1269.

4. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. *No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;* nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1 (emphasis added).

5. *Carlson I*, 798 P.2d at 1278.

6. *Id.* at 1274 (citing *Toomer v. Witsell*, 334 U.S. 385, 397, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948)).

7. *Id.* at 1278.

8. *Id.*

9. *Id.* (quoting *Taylor v. Conta*, 106 Wis.2d 321, 316 N.W.2d 814, 823 n. 17 (1982)).

10. U.S. Const. art. I, § 8, cl. 3.

11. *See Carlson v. State, Commercial Fisheries Entry Comm'n*, 919 P.2d 1337, 1338 (Alaska 1996) (*Carlson II*).

12. *Id.* at 1343. We also upheld the superior court's conclusion that the fee schedule did not violate the Commerce Clause. *Id.* at 1340–41.

13. *Id.* at 1343. After *Carlson II*, the legislature amended the permit schedule to reflect our decisions in *Carlson I* and *Carlson II*.; *see* note 2 *supra*.

14. *Id.* at 1344–45.

In *Carlson III*[15] the parties disputed which components of Alaska's fisheries budget would be factored into the permissible fee differential. We determined that it was proper to include direct and indirect fisheries costs, capital costs directly supporting fisheries, and the hatchery loan fund subsidy.[16] We disallowed inclusion of general government expenditures in calculating the permissible fee differential.[17] We again remanded the case to the superior court, this time to determine whether fee proportionality existed "in any particular instance" and whether the state owed a refund to any members of the class.[18]

On remand from *Carlson III*, the superior court directed the state to calculate the annual permissible differential from 1984 to 2002. But the parties disputed the accounting method for historical nonresident fees. The state moved for summary judgment, arguing that nonresident fees should be averaged across permit and license types to yield a "collective" class differential; the class cross-moved for summary judgment, arguing that each class member's historical fee should be treated individually. The superior court adopted the class's individual accounting method and ordered the state to pay refunds to nonresident commercial fishermen who paid cumulatively more than the permissible differential. The state appeals.

## III. STANDARD OF REVIEW

■ We review an award of damages for abuse of discretion and independently review the law applied by the superior court.[19] Whether the superior court correctly applied the law—that is, whether it complied with our mandate in *Carlson III*—whether it supported its order with findings sufficient to permit appellate review, whether it incorrectly ruled that the state's theory of collective accounting was waived, and whether the historical 3:1 fee differential for nonresident fees is constitutional are all questions of law, to which we apply our independent judgment.[20]

## IV. DISCUSSION

### A. *Carlson II* and *III* Require Individual Accounting of Nonresident Fees.

■ The state first argues that the formula for complying with the Privileges and Immunities Clause has not been completely determined, and therefore, that it is entitled to argue for collective accounting of nonresident fees. We reject this argument.

Our previous *Carlson* decisions make clear that nonresident fees should be compared individually to the permissible differential. For instance, when we calculated the individual Alaska resident's annual contribution to the fisheries budget in *Carlson II*, we anticipated that an individual accounting of nonresident fees would determine the state's liability: "[I]n 1982 *the difference between a resident and nonresident permit* could not substantially exceed $48.14, while in 1986 the difference could not substantially exceed $59.34." [21] In *Carlson III* we further ex-

---

15. *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851 (Alaska 2003) (*Carlson III*).

16. *Id.* at 865–66, 867–68.

17. *Id.* at 866–67.

18. *Id.* at 864.

19. *Breck v. Moore*, 910 P.2d 599, 606 (Alaska 1996).

20. *Carlson III*, 65 P.3d at 858.

21. *Carlson II*, 919 P.2d at 1345 (Appendix A) (emphasis added). During this period, former 20 AAC 05.240(a) (repealed 12/21/2002, Register 164) provided in part:

(1) the resident annual fee for the issuance or renewal of an entry permit or interim-use permit in a limited fishery is .25 percent of the estimated value of the entry permit, rounded to the nearest fee class amount . . . the non-resident annual fee is three times this amount. . . .

(2) the resident annual fee for the issuance or renewal of an interim-use permit in an unlimited fishery is .25 percent of the estimated average gross earnings per permit in the most recent three years for which data are available, rounded to the nearest fee class amount . . . the non-resident fee is three times this amount. . . .

. . . .

(4) the resident and non-resident annual fees are:

| FEE CLASS | ANNUAL FEE | |
| --- | --- | --- |
| | Resident | Non-Resident |
| I | $250 | $750 |
| II | 200 | 600 |

plained that a Privileges and Immunities violation turns on individual accounting of nonresident fees:

> The formula [derived in *Carlson II* ] calculates the per capita resident contribution to the cost of fisheries management, regardless of whether this person is a fisher. . . . The figure determined by this formula for any given year is then compared to *the actual fee differential charged.* If the fee differential paid by the nonresident commercial fishers, i.e., *the nonresident fee minus the resident fee for the same access,* exceeds the resident contribution as calculated by the formula, then "the State will have failed to demonstrate that the means employed by its statute have a substantial enough relationship to the legitimate interest of the statute to survive Privileges and Immunities Clause review." [22]

By comparing nonresident and resident fees "for the same access," we clearly indicated that the relevant comparisons are between individual permit holders. The various permits grant access to different fisheries, whose profitability, permit prices, and hence permit fees, vary widely.[23] When we remanded the case to the superior court in *Carlson III*, we directed the court to consider individual rather than collective differentials paid by nonresidents: "We leave to the superior court on remand to determine whether proportionality exists *in any particular instance.* . . ."[24] In order to compare fees paid by residents and nonresidents, the superior court must differentiate among the various fee classes.

In light of our previous holdings in this case, we decline to consider the state's arguments that the fees paid by nonresidents should be averaged for comparison to the per capita resident contribution to fisheries management. In advancing this argument, the

state is attempting to resuscitate an issue previously decided. Furthermore, if the state were allowed to balance its books retrospectively by averaging the nonresident differential across fee classes, this would not necessarily bring the 3:1 scheme into compliance with the Privileges and Immunities Clause. Under the state's proffered averaging method, nonresident permit holders in higher fee classes would in effect pay the differential due from nonresidents in lower fee classes, but similarly situated resident permit holders would bear no such burden.[25] Thus, the fee schedule would continue unconstitutionally to favor residents over nonresidents.

## B. The Superior Court Correctly Determined that the State Violated the Privileges and Immunities Clause.

The state next argues that the "constitutional issue" (i.e., its liability) has not yet been determined, because the superior court did not explicitly rule that nonresident fees substantially exceed resident fees. The state here makes two related arguments: First, it implies that there has been no ruling yet on its liability. Second, it argues that it is impossible to infer the superior court's reasoning supporting its judgment that the state violated the Privileges and Immunities Clause. We reject both arguments.

### 1. Liability vs. damages

In the context of this case, the state's distinction between liability and damages is artificial. In three previous decisions, as noted above, we have clearly established that nonresident fees should be compared to resident fees plus the permissible differential *on an individualized basis.* It is past the time that the state may argue for a collective

|     |     |     |
| --- | --- | --- |
| III | 150 | 450 |
| IV  | 100 | 300 |
| V   | 50  | 150 |

**22.** *Carlson III,* 65 P.3d at 863 (citing *Carlson II,* 919 P.2d at 1344) (emphasis added).

**23.** *See* note 43 *infra.*

**24.** *Carlson III,* 65 P.3d at 864 (emphasis added).

**25.** We note that disparity of treatment based on fee class, applying equally to residents and non-

residents, does not implicate the Privileges and Immunities Clause. Any challenge to this sort of disparity would likely fail, given the legislature's broad taxing power and the considerably more lenient standards of review under the Equal Protection and Due Process Clauses; *see, e.g., Baldwin v. Fish & Game Comm'n of Montana,* 436 U.S. 371, 389–90, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).

approach to determining whether the amounts charged to non-residents violate the Privileges and Immunities Clause.

## 2. Sufficiency of the superior court's findings

■ According to the state, "[n]othing in the record provides a sufficiently clear rationale supporting the conclusion that the nonresident fees lack a reasonable relationship to the allowable differentials, regardless of whether the allowable differentials are applied individually or collectively to the class." We disagree.

In *Alaska Wildlife Alliance v. State*[26] we upheld a superior court order dismissing Alaska Wildlife's complaint, despite the lack of findings of fact and conclusions of law accompanying the superior court's order, since the court's rationale could be inferred from the record.[27] We noted that "[i]n most cases involving dismissal or summary judgment, the grounds for the superior court's ruling can be discerned from the parties' motion papers."[28] Furthermore, Alaska Civil Rule 52(a) provides that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions [for summary judgment]."

Applying these standards to the present case, we conclude that the superior court found the state liable to those class members who paid more than the permissible differen-

tial. As indicated above, we have already determined in our earlier decisions in this case that nonresident fees should be compared individually rather than collectively to resident fees plus the permissible differential. The superior court applied this rule when it denied the state's motion for summary judgment and granted the class's cross-motion. In its order, which attempts to implement our earlier *Carlson* decisions and to enforce the stipulation between the parties,[29] the court implicitly held the state liable in every case where an individual nonresident's cumulative payments exceeded the relevant resident fee plus permissible differential. The superior court directed the state to calculate and pay refunds for past overcharges in the following way: "The State shall ... summariz[e] each class member's refund with interest, using the allowable fee differential each year ... The individual refund will be calculated as provided in ... the February 12, 2001 Stipulation and Order." In the February 12, 2001 Stipulation and Order, which the parties signed after *Carlson II* and before *Carlson III*, the state agreed that it would set off an individual's refund by any underpayment, but agreed that it would not otherwise attempt to recapture previous underpayments by nonresident fishermen.[30] Thus, it is clear that the superior court was both applying our earlier *Carlson* decisions and holding the state to its earlier stipulation when it held that the state had violated the

---

**26.** 74 P.3d 201 (Alaska 2003).

**27.** *Id.* at 205–07 (superior court may be affirmed if grounds for ruling "discernible sufficiently from the record to permit appellate review").

**28.** *Id.* at 206.

**29.** The parties had previously agreed on the method for determining fees in the future, which the superior court included in the same order:
Beginning with the 2005 licensing year, and for the foreseeable future, the annual nonresident [fee] will be calculated as follows: Once every three years, the Commercial Fisheries Entry Commission ... will calculate an average of the annual differentials for the five most recent fiscal years for which the Office of Management and Budget ... has provided the Commission with differentials. The Commission will round the calculated average to the nearest five dollars. This rounded average will be the differential that the Commission will

impose on a nonresident permit holder for each of the next three years. It will also be the differential that the Alaska Department of Fish and Game will impose on a nonresident crewmember license holder for each of the next three years.

**30.** According to the February 12, 2001 Stipulation and Order:
The refunds will incorporate a setoff for fee and license underpayments on an individual basis. That is, if the permissible differential exceeds the actual differential for a permit held by an individual, the difference will be deducted from the cumulative overpayments that are due that individual. Underpayments will include interest at the same rate as overpayments. If a member has cumulative underpayments that exceed the member's cumulative overpayments, the State will not assess or attempt to collect the difference from the member.

Privileges and Immunities Clause and for that reason granted summary judgment to class members who had paid more than the permissible differential.

### C. The State Has Failed To Demonstrate Proportionality Between Means and End.

#### 1. The discriminatory measure must be rationally related to a valid purpose.

The Supreme Court has held that states should be granted considerable leeway in enacting taxes.[31] However, when a tax implicates a federal right, and in the case of discrimination against nonresidents, implicates federalism itself, courts will hold the taxing scheme to a higher standard. As Justice Marshall wrote for the majority in *Austin v. New Hampshire:*[32]

> In resolving constitutional challenges to state tax measures this Court has made it clear that "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification." Our review of tax classifications has generally been concomitantly narrow, therefore, to fit the broad discretion vested in the state legislatures. When a tax measure is challenged as an undue burden on an activity granted special constitutional recognition, however, the appropriate degree of inquiry is that necessary to protect the competing constitutional value from erosion.
>
> .... The Privileges and Immunities Clause, by making noncitizenship or non-residence an improper basis for locating a special burden, implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so, the structural balance essential to the concept of federalism. Since nonresidents are not represented in the taxing State's legislative halls ... judicial acquiescence in taxation schemes that burden them particularly would remit them to such redress as they could secure through their own State; but "to prevent (retaliation) was one of the chief ends sought to be accomplished by the adoption of the Constitution." Our prior cases, therefore, reflect an appropriately heightened concern for the integrity of the Privileges and Immunities Clause by erecting a standard of review substantially more rigorous than that applied to state tax distinctions among, say, forms of business organizations or different trades and professions.[33]

As we have stated previously in *Carlson I* and *Carlson II*, the state may charge nonresidents more than residents in order to equalize the burden of fisheries management between them.[34] However, the state must also demonstrate that the discriminatory fee system bears "a substantial relationship" to its goal.[35] The state should meet this burden by calculating the resident contribution to fisheries management and comparing it with the challenged differentials charged to nonresidents.[36] We indicated that these two quantities must be "equivalent" in order for the fee differential to be constitutional.[37] That is, if the fee differential substantially exceeds the resident contribution, the state will have failed to demonstrate that the fees have "a substantial enough relationship" to the goal of equalizing economic burdens to comply with the Privi-

---

31. *Lunding v. New York Tax Appeals Tribunal,* 522 U.S. 287, 297, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998).

32. 420 U.S. 656, 662–63, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975) (internal citations omitted).

33. *Id.* at 661–63, 95 S.Ct. 1191 (striking down nonresident commuter tax) (citations omitted).

34. *Carlson I,* 798 P.2d 1269, 1278 (Alaska 1990); *Carlson II,* 919 P.2d 1337, 1342 (Alaska 1996). Even more recently, in *State v. Dupier,* 118 P.3d 1039, 1053–54 (Alaska 2005), we again affirmed the state's right to charge nonresidents more than residents for access to commercial fisheries in Alaska, subject to the limits enunciated in our *Carlson* decisions.

35. *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985).

36. *Carlson II,* 919 P.2d at 1342 ("[T]he resident contribution can be compared to the difference in fees paid by nonresidents to determine if the fee differential is constitutional.").

37. *Id.*

leges and Immunities Clause.[38] Thus something less than strict equality is allowable; the nonresident fees will comply with the clause if they are not "substantially in excess" of the allowable differential. That is, the discriminatory measure must bear a "reasonable relationship" to a valid state objective.[39] It is enough if the state achieves a "a reasonably[ ] fair distribution of burdens,"[40] since absolute equality "is impracticable in taxation."[41]

■ In examining the challenged statutory scheme, we may consider the availability of less restrictive means to achieve the state's valid objective.

2. **The 3:1 fee scheme is not rationally related to the goal of equalizing the burden of fisheries management between nonresidents and residents.**

■ In *Carlson III* we stated: "The record must support the belief that a rational relationship exists between the [actual nonresident] fee differential and the average cost of fisheries management to the resident."[42] The challenged 3:1 formula is not rationally related to the goal of equalizing the fisheries management burden. If in a given year the nonresident fee differential for a particular fee class equals or falls below the permissible differential, this is pure chance, since the challenged differential is not tied to Alaska's fisheries budget. Under former AS 16.43.160(b) and 20 AAC 05.240(a), fees are based on permit price and fishing profits. Under this regime, the ratio between actual nonresident differentials and the permissible differential is a matter of fortuity and nothing else. When fishing profits and permit values are on the decline, nonresidents may pay less than the permissible differential; in good years they may pay more.[43]

The Supreme Court has indicated that an arbitrary taxing scheme may implicate the Privileges and Immunities Clause even if it should accidentally have no more than a *de minimis* effect in a given year. For instance, in *Lunding v. New York Tax Appeals Tribunal,* the challenged New York tax law denied nonresident taxpayers a state income tax deduction for alimony payments.[44] A Connecticut resident who worked in New York claimed that the law violated the Privileges and Immunities Clause.[45] On behalf of the state, it was argued that the challenged law could not have any more than "a *de minimis* effect on the run-of-the-mill taxpayer or comity among the States," since the nonresident's home state would likely provide a deduction or credit for income taxes paid to other states.[46] The Court rejected this argument, noting that such a credit was unavailable to the petitioner in the relevant year since Connecticut did not impose an income tax on the petitioner's earned income.[47] Ad-

38. *Id.* at 1344.

39. *Carlson III*, 65 P.3d 851, 864 (Alaska 2003).

40. *Travelers' Ins. Co. v. Connecticut,* 185 U.S. 364, 371, 22 S.Ct. 673, 46 L.Ed. 949 (1902).

41. *Lunding v. New York Tax Appeals Tribunal,* 522 U.S. 287, 297, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) ("[A]s a practical matter, the Privileges and Immunities Clause affords no assurance of precise equality in taxation between residents and nonresidents of a particular State.").

42. *Carlson III*, 65 P.3d at 864; *see also Tangier Sound Waterman's Ass'n v. Pruitt,* 4 F.3d 264, 267 (4th Cir.1993).

43. In *Carlson II* we noted the large profit variation between various fisheries and within the same fishery from year to year:

The profitability of the different fisheries, and hence the value of permits, varies dramatically. For example, the average gross earnings per permit for the Chignik salmon seine fishery ranged from $88,709 to $265,525 for the years 1983 through 1993. The permit fee for this fishery is $250 for residents and $750 for nonresidents. During the same time period the average gross earnings per permit for the Bristol Bay herring spawn on kelp fishery ranged from $847 to $1613. The permit fee for this fishery is $50 for residents and $150 for nonresidents.
919 P.2d at 1338 n. 4. The state has not argued, nor does the record indicate, that costs of fisheries management bear any relation to fishing profits.

44. 522 U.S. 287, 291–92, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998).

45. *Id.* at 293, 118 S.Ct. 766.

46. *Id.* at 313, 118 S.Ct. 766.

47. *Id.* at 313–14, 118 S.Ct. 766.

ditionally, the nonresident's enjoyment of the privileges and immunities afforded to residents could not depend upon mere chance.[48] As noted previously, there may be a legitimate justification for the discrimination, but the degree must be proportional to the justification.[49]

### D. Incidental Inequality Is Permissible Within a Rational Scheme.

Where a tax or fee that differentiates between residents and nonresidents is rationally related to a valid state purpose, mere inequality in a given year will not necessarily implicate the Privileges and Immunities Clause. In *Travelers' Insurance Co. v. Connecticut,*[50] for instance, the Supreme Court stated that "the mere fact that in a given year the actual workings of the system may result in a larger burden on the nonresident [does not necessarily] vitiate the system, for a different result might obtain in a succeeding year...."[51] It is in this sense, in terms of unavoidable anomalies within a rational system, that the state is required to guarantee only substantial, rather than precise, equality.[52] As we made clear in *Carlson III*, "precise equality in taxation between

residents and non-residents" is not required.[53]

This is clearly the case with the prospective method of calculating the permissible differential to which the parties agreed and which the superior court approved. Under this scheme, the state determines the permissible differential to be charged nonresidents over the next three years by averaging the resident contribution to fisheries management over the previous five years. Under this scheme, the nonresident differential is directly related to the fisheries budget, although exact equality is not guaranteed. Since the state is not required to guarantee precise equality prospectively, we conclude that it should not be required to provide it retrospectively, either. We see no reason why the superior court may not apply a rational retrospective scheme, similar to that stipulated by the parties going forward in their February 2001 stipulation, in order to determine the legitimate variation between actual nonresident fees and permissible nonresident fees and the amount of any refunds. The problem is to determine the extent to which fee differentials may depart from perfect equality and still pass constitutional muster.

**48.** "Nor, we may add, can the constitutionality of one State's statutes affecting nonresidents depend upon the present configuration of the statutes of another State." *Id.* at 314, 118 S.Ct. 766 (quoting *Austin v. New Hampshire,* 420 U.S. 656, 668, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975)); *see also Travis v. Yale & Towne Mfg. Co.,* 252 U.S. 60, 81, 40 S.Ct. 228, 64 L.Ed. 460 (1920) (striking down another New York tax law which denied tax exemptions to nonresidents working in New York, and noting that "it would be rash to assume" that nonresidents have untaxed income from sources other than New York employment which compensate for exemptions denied them in New York).

**49.** Under the Supreme Court's comparatively stricter Commerce Clause jurisprudence, a tax which facially discriminates against interstate commerce is almost per se a violation of the Commerce Clause, regardless of the degree of discrimination. *Fulton Corp. v. Faulkner,* 516 U.S. 325, 334 n. 3, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) (There is no *"de minimis* defense" to a charge of discriminatory taxation under the Commerce Clause.); *Wyoming v. Oklahoma,* 502 U.S. 437, 455, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (The degree of a differential burden on interstate commerce "measures only the extent of the discrimination" and "is of no relevance to

the determination whether a State has discriminated against interstate commerce."); *Maryland v. Louisiana,* 451 U.S. 725, 760, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) ("We need not know how unequal [a][t]ax is before concluding that it unconstitutionally discriminates."); *see also* JEROME R. HELLERSTEIN & WALTER HELLERSTEIN, STATE TAXATION ¶ 4.13[1][a], at 4–71 & ¶ 4.13[1][d], at 4–72 (3d ed.2005).

**50.** 185 U.S. 364, 22 S.Ct. 673, 46 L.Ed. 949 (1902); *see also Maxwell v. Bugbee,* 250 U.S. 525, 543, 40 S.Ct. 2, 63 L.Ed. 1124 (1919) ("[I]nequalities that result not from hostile discrimination, but occasionally and incidentally in the application of a system that is not arbitrary in its classification, are not sufficient to defeat the law.").

**51.** *Travelers' Ins. Co.,* 185 U.S. at 369, 22 S.Ct. 673.

**52.** *See id.* at 371, 22 S.Ct. 673 ("It is enough that the State has secured a reasonably fair distribution of burdens....").

**53.** 65 P.3d at 864 n. 96 (quoting *Lunding,* 522 U.S. at 293, 118 S.Ct. 766).

In determining whether the inequality between residents and nonresidents exceeds "substantial equality of treatment"—that is, in determining whether the variation between nonresident fee differentials and the nonresidents' fair burden of fisheries management costs is permissible—the superior court should determine whether the difference falls within a reasonable margin of error. We have been unable to locate cases that analyze the appropriate margin of error in the context of the "substantial equality of treatment" standard. But in the parallel context of tax apportionment, which examines the constitutionality, under due process, of allowable margins of error for determining taxation for corporations that conduct business across state lines, there is helpful precedent.

In such cases the Supreme Court has held that in order to show that a formula is unconstitutional, "the taxpayer [must prove] by 'clear and cogent evidence' that the income attributed to the State" (analogous in this case to the permissible nonresident fees), is "out of all appropriate proportion to the business transacted"[54] (analogous to the actual nonresident fees), "or has 'led to a grossly distorted result.'"[55] While the cases establish no bright line for determining what qualifies as "out of all appropriate proportion," we consider it significant that the Supreme Court has only twice found a variation to be unconstitutional. In *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell*,[56] the Court found the statutory formula unconstitutional when there was more than a 250 percent difference[57] between the statutory formula's calculation of the amount of in-state taxpayer income and the actual amount of in-state taxpayer income. Likewise, in *Norfolk & Western Railway v. Missouri State Tax Commission*,[58] the Court held unconstitutional a formula with a margin of error of approximately 163 percent. In all other cases to come before it, the Court has upheld all margins of error that fell below those at issue in *Hans Rees' Sons* and *Norfolk & Western Railway*. Thus, for example, in *Container Corporation of America v. Franchise Tax Board*, the Court upheld a fourteen percent difference between alternative tax formulas.[59] In *Moorman Manufacturing Company v. Bair*, the Court held that a forty-eight percent difference between the alternative formulas was constitutional.[60] State appellate courts, following these cases,

---

**54.** *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 274, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (quoting *Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell*, 283 U.S. 123, 135, 51 S.Ct. 385, 75 L.Ed. 879 (1931)).

**55.** *Id.* (quoting *Norfolk & W. Ry. v. Missouri State Tax Comm'n*, 390 U.S. 317, 326, 88 S:Ct. 995, 19 L.Ed.2d 1201 (1968)).

**56.** 283 U.S. at 132–36, 51 S.Ct. 385.

**57.** A leading treatise on taxation has noted that "bare percentages without explanation are not helpful to a determination of the issues at hand." 1 JEROME R. HELLERSTEIN & WALTER HELLERSTEIN, STATE TAXATION ¶ 8.15 (3d ed.1998) (quoting *Citizens Utils. Co. v. Department of Revenue*, 111 Ill.2d 32, 94 Ill.Dec. 737, 488 N.E.2d 984, 993 (1986)). Our review of the tax apportionment cases shows that courts do not use universally accepted terminology to describe variations (or "disparities") between the result obtained by applying the state's assessment formula and the result obtained by the taxpayer's approach (or between the state's and the taxpayer's valuation of property). Some courts simply compare the state's tax assessment to the taxpayer's assessment under its own desired formula and express the difference as a percentage; *e.g., Stonebridge*

*Life Ins. Co. v. Department of Revenue*, 18 Or. Tax 423, 2006 WL 448682, 1, 5 n. 16 (Or. T.C.2006). Thus, if the state's formula yields a tax of $200 and the taxpayer's formula yields a tax of $100, there is said to be a "200% variance." As a pure mathematical proposition, this seems clearly wrong to us. (If the government's assessment yielded a tax of $100 and the taxpayer's methodology yielded a tax of $100, it would make no sense to speak of a "100% variance.") Accordingly, we use the methodology used by other courts: we determine the dollar differences in the results obtained by each methodology and then express the relationship between that difference and the taxpayer's result as a percentage variance; *e.g., Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159, 181, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). Thus, if the government's assessment is $150 and the taxpayer's is $100, we would say that there is a 50% variance.

In this opinion we have cited only to cases that use the methodology we believe to be correct.

**58.** 390 U.S. at 326, 88 S.Ct. 995.

**59.** 463 U.S. at 184, 103 S.Ct. 2933

**60.** 437 U.S. at 275, 98 S.Ct. 2340.

have consistently held differences under 100 percent to be constitutional.[61]

These cases demonstrate that the search for precision is illusory and that there are constitutionally acceptable variations from mathematical equality in the structuring of tax regimes. The same is true for the structuring of resident and nonresident fishing fees. From this case law, we conclude that an allowable margin of error may be found in the range up to fifty percent.[62]

Because the superior court required precise equality between the burdens shouldered by residents and nonresidents, we vacate the superior court's order pertaining to calculation of refunds. We remand for the superior court to determine whether any inequality between residents and nonresidents was incidental—and therefore constitutionally tolerable—or substantial—and thus unconstitutional.[63]

## V. CONCLUSION

When historical commercial fishing fee differentials are compared to permissible differentials, it is apparent that the 3:1 fee schedule is not rationally related to the state's goal of equalizing the burden of fisheries management between nonresidents and residents. A fee scheme substantially related to the state's goal will guarantee substantial, rather than precise, equality. Because the state should be held to this standard retrospectively as

well as prospectively, we VACATE the portion of the superior court's order requiring the state to pay refunds based on strict equality and REMAND the case for further proceedings consistent with this opinion.

BRYNER, Chief Justice, not participating.

much of the data relevant to assessing the extra costs associated with non-resident commercial fishing licenses. Bearing in mind that the state should set the added cost associated with a non-resident commercial fishing license fee at a rate that is substantially equal to the amount that residents pay (and non-residents do not pay) in support of Alaska's fisheries, we recognize nonetheless that there is no single correct method of allocation and that uncertainties exist with respect to any formula. We therefore accord the state considerable leeway in its calculations. The fifty percent margin of error is intended to reflect this leeway.

---

**61.** *See, e.g., Unisys Corp. v. Pennsylvania.*, 726 A.2d 1096 (Pa.Cmwlth.1999) (holding that forty-five percent disparity in state's apportionment taxation formula was not outside constitutional margin of error); *General Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 869 (Tex.App.1996) (holding that a twenty-eight percent difference between formulas was constitutional because the Supreme Court has upheld "percentage disparities ranging between 14–93%.").

**62.** Even though greater margins of error have been upheld in some of the taxation allocation cases discussed above, the constitutional analysis is not resolved by mere reference to a universally applicable maximum margin of error. While we do not require mathematical precision, an acceptable margin of error should be based on the accuracy that is reasonably attainable in individual cases. In this case, the state seems capable of relatively greater accuracy in its measurements than in many of the tax allocation cases cited above. Importantly, the state possesses

**63.** The class argues that the years 2003 and 2004 merit refunds as well, since the parties agreed that each nonresident would pay only one differential, regardless of how many permits that nonresident held, but, they allege, the CFEC did not adopt this "one differential per person" approach until 2005. The superior court should determine this factual question on remand.