**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellant,**

v.

**Donald H. CARLSON, Warren Hart, Gerard Haskins, Earl Weese, and Lyla C. Weese, Individually and as Class Representatives on Behalf of All Persons Similarly Situated, Appellees.**

No. S–13818.

Supreme Court of Alaska.

Jan. 20, 2012.

Rehearing Denied Feb. 21, 2012.

As Modified on Rehearing April 13, 2012.

Michael W. Sewright, Lance B. Nelson, and Ruth Botstein, Assistant Attorneys General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellant.

Loren Domke, Loren Domke, P.C., Juneau, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

We decide one primary issue in this fifth appeal in this case. After our last remand, the superior court entered a judgment awarding the class a principal refund of $12.4 million with prejudgment interest exceeding $62 million. The question presented is whether one of our previous decisions in this case, *Carlson III*, incorrectly decided that the rate of prejudgment interest for unconstitutional commercial fishing license and limited entry permit fee overpayments is the statutorily imposed punitive interest rate for underpaid and overpaid taxes under Title 43 of the Alaska Statutes. Because the statute establishing prejudgment interest for underpayment and overpayment of taxes does not apply to the refund of overpayment of the commercial fishing fees involved in this case, and because our earlier incorrect holding on this issue resulted in a manifest injustice, we now conclude that our earlier decision on this issue must be overruled. We accordingly remand this case for a new prejudgment interest calculation.

## II. FACTS AND PROCEEDINGS

This is the fifth time this case has come before us. The case started in 1984 when the class sued the State, Commercial Fisheries Entry Commission (CFEC) on behalf of all nonresident Alaska commercial fishers.[1] The class included "all persons who participated in one or more Alaska commercial fisheries at any time who paid non-resident assessments to the State for commercial or gear licenses or permits."[2] Arguing that the State was illegally charging nonresidents more than it charged residents for commercial fishing permits and licenses, the class demanded a refund of the difference between what they paid and what residents paid.[3] Between 1984 and 2002, nonresident commercial fishers paid three times as much as resident fishers for licenses and permits.[4] Understanding the prejudgment interest issue in this appeal requires a brief review of the earlier appellate decisions in this case.

---

1. *Carlson v. State, Commercial Fisheries Entry Comm'n,* 798 P.2d 1269, 1270 (Alaska 1990) (*Carlson I*).

2. *Id.*

3. *Id.* License fees are no longer at issue in this case; only limited entry fees are.

4. From 1977 to 2001, AS 16.43.160(b) stated:

Annual fees established under this section shall be no less than $10 and no more than $750 and shall reasonably reflect the different rates of economic return for different fisheries. *The amount of an annual fee for a nonresident shall be three times the amount of the annual fee for a resident.*
(Emphasis added.)
The legislature repealed this section in 2001 and added a new section on nonresident fees.

## A. *Carlson I*

In *Carlson I* we held that the different fees for residents and non-residents implicated, but did not necessarily violate, the Privileges and Immunities Clause of the United States Constitution.[5] We concluded that under United States Supreme Court precedent, the State may "charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay."[6] We then remanded to the superior court to determine whether the three-to-one fee differential met this standard.[7]

We conducted a similar analysis of the class's Commerce Clause[8] challenge, and while we did not determine that the Clause was implicated, we similarly remanded for a determination whether fees paid by non-residents were substantially equal to the pro-rata shares of fees and taxes devoted to fisheries management paid by residents.[9]

Next we addressed the question whether class members would be entitled to a refund of overpaid fees if they prevailed on their constitutional claims. Although we did not explicitly determine that the fees at issue here were taxes,[10] we nonetheless held that the tax refund statute codified at AS 43.15.010(a) (subsequently renumbered AS 43.10.210(a))[11] provided the basis for a potential refund for the class.[12] We therefore remanded to determine whether the class had met the statutory protest requirement, thereby providing sufficient notice to the State, or whether the State had waived that requirement.[13] Finally, we noted, sua sponte, that there was "a specific statute of limitations applicable to claims for tax refunds," AS 43.05.275, which applied to the class's refund claim.[14]

## B. *Carlson II*

In *Carlson II* we concluded that the class's challenge to differential fees based on resi-

---

Ch. 27, §§ 5, 7, SLA 2001. Effective 2002, non-resident fees were covered by AS 16.43.160(e): For an entry permit or an interim-use permit issued for calendar year 2002 and following years, the annual base fee may not be less than $10 or more than $300. The annual base fee must reasonably reflect the different rates of economic return for different fisheries. *The fee for a nonresident entry permit or a nonresident interim-use permit shall be higher than the annual base fee by an amount, established by the commission by regulation, that is as close as is practicable to the maximum allowed by law.* The amount of the fee for a nonresident entry permit or a nonresident interim-use permit may reflect [various costs associated with fisheries management].
Ch. 27, § 5, SLA 2001 (emphasis added).
In 2005 the statute was amended to provide: In addition to the annual base fee established by the commission under this subsection, a nonresident shall pay an annual nonresident surcharge for the issuance or renewal of one or more entry permits or interim-use permits. The commission shall establish the annual nonresident surcharge by regulation at an amount that is as close as is practicable to the maximum allowed by law.
AS 16.43.160(c); Ch. 16, § 3, SLA 2005.

5. *Carlson I*, 798 P.2d at 1274–76; U.S. Const. art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

6. *Carlson I*, 798 P.2d at 1274–75 (quoting *Toomer v. Witsell*, 334 U.S. 385, 399, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (internal quotation marks omitted) (emphasis in original omitted)).

7. *Id.* at 1276–78.

8. U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes....").

9. *Carlson I*, 798 P.2d at 1276–78. We also held that, assuming the three-to-one ratio was constitutional, the CFEC was authorized by statute to impose the differential fees. *Id.* at 1278–79.

10. *Id.* at 1280 ("[I]n the abstract, the class might avail itself of [the tax refund] statute to recover any unconstitutionally extracted fees.").

11. *See State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 870 n. 119 (Alaska 2003) (*Carlson III*).

12. *Carlson I*, 798 P.2d at 1279–80 (reversing superior court's ruling that a refund was not an available remedy).

13. *Id.*

14. *Id.*

dency did not implicate the Commerce Clause.[15] We reaffirmed our conclusions from *Carlson I* on the applicability of the Privileges and Immunities Clause and set out a formula for determining whether the fee differential passed muster under that Clause.[16] We remanded for the superior court to apply this formula.[17] We further confirmed that AS 43.10.210 was the statute governing refund eligibility and that the class had to satisfy the protest requirement of AS 43.10.210 in order to succeed on the merits.[18] We concluded by directing the superior court to determine "whether the filing of this suit constituted notice sufficient to comply with the protest requirement of AS 43.10.210(a), and whether[, as the class contended,] prejudgment interest is due under AS 45.45.010." [19]

### C. *Carlson III*

*Carlson III* dealt with four sets of issues. First, we declined to readdress the constitutional issues decided in *Carlson I* and *II*.[20] We reasoned that two United States Supreme Court decisions issued subsequent to our *Carlson* decisions did not require us to reevaulate our earlier decisions.[21] Second, we dealt with a series of questions concerning what state expenditures and revenues were to be included in the formula for determining whether the three-to-one fee differential produced substantial equality of payment between residents and non-residents.[22] Third, we concluded that the class met the protest requirement—and thus provided sufficient notice to the State—by filing its complaint, and that at this point in the litigation it was too late for the State to claim that

sovereign immunity protected it from this particular suit.[23]

Finally, and most importantly for this appeal, we held that because we had applied Title 43's statutory limitations period and refund provision, Title 43's interest provision for overpayment of taxes—AS 43.05.280—applied to any refund that might be due to the class.[24]

### D. *Carlson IV*

In *Carlson IV*[25] we finally reached the question whether the three-to-one fee differential violated the Privileges and Immunities Clause. We held that it did.[26] We therefore remanded to the superior court to determine whether the inequality in a given year was "incidental," thus affording no refund, or "substantial," thus allowing a recovery.[27] We directed the superior court to calculate any refund owed to the class on that basis.[28]

### E. Remand Following *Carlson IV*

After determining the acceptable amount of inequality in the fee structure, the superior court on remand found, based on calculations performed by the State, that the principal refund that the State owed the class totaled $12,443,959.18. Using the punitive interest rate for underpayments and overpayments of taxes under Title 43, AS 43.05.280 and 43.05.225(a), prejudgment interest was calculated at 11% compounded quarterly, totaling $62,356,738.10 through January 31, 2010. The superior court then determined after the substantive issues were settled that the State owed the class attorney's fees under Alaska Civil Rule 82. It

15. *Carlson v. State, Commercial Fisheries Entry Comm'n*, 919 P.2d 1337, 1340–41 (Alaska 1996) (*Carlson II*).

16. *Id.* at 1341–43.

17. *Id.* at 1344.

18. *Id.*

19. *Id.*

20. *Carlson III*, 65 P.3d 851, 859–60 (Alaska 2003).

21. *Id.* at 859–63.

22. *Id.* at 863–69.

23. *Id.* at 870–72, 873–74.

24. *Id.* at 874–75.

25. *State, Commercial Fisheries Entry Comm'n v. Carlson*, 191 P.3d 137 (Alaska 2008) (*Carlson IV*).

26. *Id.* at 145.

27. *Id.* at 148.

28. *Id.*

awarded fees under the schedule provided in Rule 82(b)(1) for cases involving money judgments that have been contested with a trial.[29] Under the schedule, attorney's fees were calculated to be $7,482,569.73. With a cost award of $7,028.93, the total judgment against the State, including principal, equaled $82,290,295.94.

The State appealed this judgment, requesting that we reconsider our holding in *Carlson III* that prejudgment interest should be calculated under AS 43.05.280 and AS 43.05.225. The State also argued that the superior court erred in its award of attorney's fees.

Following oral argument in this case, we issued an order for supplemental briefing, asking the parties to address three issues that we had previously either decided or assumed: "(1) whether limited entry permit fees under Title 16 are taxes under AS 43.10.210, (2) whether AS 43.05.275 provides the applicable statute of limitations for refund of those fees, and (3) what statutory provision for prejudgment interest, if any, applies to refunds of unconstitutionally extracted limited entry permit fees."

We decline to readdress the first two issues as it is unnecessary to reach them. But we conclude that our previous holding in *Carlson III* that AS 43.05.280 provides the proper rate of prejudgment interest was incorrect and that this error produced a manifestly unjust result which requires us to take the extraordinary step of reversing our previous holding. We therefore remand for a new interest calculation applying the proper rate of interest as provided by AS 09.30.070.

## III. STANDARD OF REVIEW

 The law of the case doctrine, which applies even to "questionable decisions," [30] provides that "issues previously adjudicated can only be reconsidered where there exist exceptional circumstances presenting a clear error constituting a manifest injustice." [31] The doctrine applies not only to issues explicitly addressed and decided on appeal, but also to those "directly involved with or necessarily inhering in a prior appellate decision" and those "that could have been part of a prior appeal but were not." [32]

 We review attorney's fees awards for an abuse of discretion, reversing if the award is "arbitrary, capricious, manifestly unreasonable, or [if it] stemmed from improper motive." [33] "Attorney's fees awards made pursuant to the schedule in Civil Rule 82(b)(1) are presumptively correct." [34]

## IV. DISCUSSION

### A. *Carlson III*'s Holding That AS 43.05.280 Provided The Appropriate Rate Of Prejudgment Interest Was Clearly Erroneous And Led To A Manifestly Unjust Result.

*Carlson III* was one of the most complex of our decisions in this case. Our discussion of prejudgment interest was not the primary focus of that decision; before addressing prejudgment interest, we decided three sets of issues with ten separate sub-issues, turning only to prejudgment interest for three paragraphs of our 25–page decision.[35]

Because there was no statute directly providing for prejudgment interest for a refund upon overpayment of Title 16 fishing permit fees,[36] we looked to the statute providing for

**29.** Only one trial took place in this case, over three days in June 2000.

**30.** *Beal v. Beal*, 209 P.3d 1012, 1016 (Alaska 2009) (*Beal II*) (citing *Austin v. Fulton Ins. Co.*, 498 P.2d 702, 704 (Alaska 1972)).

**31.** *Carlson III*, 65 P.3d 851, 859 (Alaska 2003) (internal citations and quotations omitted).

**32.** *Beal II*, 209 P.3d at 1017 (internal quotation marks and emphasis omitted).

**33.** *Wagner v. Wagner*, 183 P.3d 1265, 1266–67 (Alaska 2008) (quoting *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007)).

**34.** *Byars v. Byars*, 945 P.2d 792, 795 (Alaska 1997).

**35.** *Carlson III*, 65 P.3d at 874–75.

**36.** *Compare* AS 16.43.160(b) providing that the CFEC "may charge interest at a rate not to exceed the legal rate of interest established in AS 45.45.010 on fees more than 60 days overdue."

a refund of tax overpayments under Title 43, AS 43.05.280:

> The introductory language of AS 43.05.275, applied to the present case in *Carlson I*, is fundamentally the same as the introductory language at issue here in AS 43.05.280 in that both apply to a tax under this title. It is hard to imagine applying section .275 and not section .280 to the present case even if one interprets the latter more strictly than the former. Alaska Statute 43.05.280 applies to all overpayment of taxes under Title 43. This statutory section should therefore apply to the provisions for recovery of overpayments laid out in AS 43.10.210. Because AS [43.10.210] serves as the primary justification for providing the class with a refund, the prejudgment interest available under AS [43.05.280] in other actions extends to the recovery of prejudgment interest for overpayment of commercial fishing fees, even though these are ostensibly created under Title 16.[37]

In short, we held that because Title 43's statute of limitations was parallel in structure to Title 43's interest rate provision, the adoption of the former compelled the adoption of the latter. Further, because we had relied on Title 43's procedures for recovering overpayment, we concluded that Title 43's interest rates for overpayment must apply. Although it was not discussed in our decision, as a result of this conclusion, the State was required to pay the punitive [38] interest rate of 11% compounded quarterly that is due for overpayments and underpayments of taxes under Title 43.[39] We conclude that our decision on this issue was wrong because the statutory language, intent, and purpose of Title 43's interest provision do not countenance its application to overpayment of Title 16 fees.

As we noted in *Carlson III*, prejudgment interest may not be awarded against the State unless the legislature or constitution has authorized it.[40] But we determined that Title 43's interest rate applied not because it was applicable by its own terms, but because we had already relied on two other provisions of Title 43 in prior decisions and it seemed consistent to apply the interest rate from that title. But by its plain language, Title 43's interest provision does not apply to the fees at issue here. Alaska Statute 43.05.280(a) provides: "Interest shall be allowed and paid on an overpayment of a tax under this title at the rate and in the manner provided in AS 43.05.225(1)."[41] The State argues that the phrase "under this title" modifies "tax," so that the tax must be imposed by Title 43 in order to permit interest payments on an overpayment. Because the fees at issue here were imposed under Title 16, the State argues that Title 43's interest provision does not apply. The class responds that AS 43.05.280(a) "applies uniformly to all state tax refunds and to interest on refunds." The class relies on Governor Jay Hammond's transmittal letter to the state legislature, describing the bill that included the future section .280 and stating an intent to provide for "uniform administrative and enforcement provisions for all of the State's tax statutes."

The State's reading of the statute is the most natural reading. The State argues that

---

**37.** *Carlson III*, 65 P.3d at 875 (footnotes omitted).

**38.** In *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 546 (Alaska 1978), we noted that "[t]he assessment of interest for late payment [of taxes] has no punitive element." But that case interpreted prior versions of AS 43.05.225 and .280 which provided a lower rate of interest than the current versions (8% versus 11%) and did not compound quarterly. *Id.*; Ch. 94, § 1, SLA 1976; Ch. 166, § 2, SLA 1976. The legislature subsequently increased the rate and made it compound to punish taxpayers who chose to hold out rather than paying under protest. Ch. 23, §§ 2–3, SLA 1991; *see also* 1991 Senate Journal 405 and discussion *infra*.

**39.** This is significantly higher than the general rate of prejudgment interest provided by AS 09.30.070 which through the life of this case has varied between 3.5% and 10.5% and which is not compounded. *See How to Determine Pre-and Post-Judgment Interest Rates—2012*, ALASKA COURT SYSTEM (Jan. 3, 2012), http://www.courts.alaska.gov/int.htm.

**40.** 65 P.3d at 875.

**41.** AS 43.05.225(1), in turn, assesses interest at a rate five points above the Federal Reserve Discount Rate or 11% (whichever is higher), compounded quarterly.

because Title 43 does not authorize overpayments, it is illogical to read "under this title" as modifying "overpayment." We agree: Because Title 43 does not authorize overpayments but does authorize a number of taxes, the phrase "under this title" should be read as modifying "taxes" rather than "overpayment."

Read against other, related provisions in Title 43, the State's proposed interpretation becomes even stronger. Alaska Statute 43.05.225(1), the section cross-referenced by AS 43.05.280 as providing the appropriate interest rate for overpayment, assesses interest against taxpayers only "when a tax *levied in this title* becomes delinquent." (Emphasis added.) It would be anomalous for the legislature to have assessed interest against the State for any overpayment of any tax, regardless of its authorizing title, but to have assessed interest owed to the State only for underpayments of those taxes specifically levied by Title 43.

Similarly, AS 43.05.280(c) provides that there is no interest due to a taxpayer "[i]f an overpayment of a tax *imposed by this title* is refunded within 90 days." (Emphasis added.) Under the class's view that AS 43.05.280(a) applies to all taxes regardless of authorizing title, section .280(c) would create a 90–day interest-free window for refunds of taxes levied under Title 43, but allow for no such window for those levies scattered throughout the rest of the Alaska statutes. We can see no rationale for why the legislature would have held the State to a stricter payment window for Title 16 fees than for Title 43 taxes. Accordingly, we conclude that the legislature must have meant subsections (a) and (c) to have the same reach. The unambiguous language of subsection (c) (as well as AS 43.05.225(1)) clarifies any arguable ambiguity in subsection (a): The punitive interest rate provided by AS 43.05.280(a) ap-

plies only to overpayment of taxes levied under Title 43.

 When interpreting a statute, we do not stop with the plain meaning of the text. Instead, we apply a sliding scale approach, where "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." [42] "We apply this sliding scale approach even if a statute is facially unambiguous." [43]

The class rests its argument about the applicability of section .280 largely on legislative intent. The class points to Governor Jay Hammond's transmittal letter as providing for "uniform administrative and enforcement provisions for all of the State's tax statutes." [44] The letter, the class notes, points out that prior to the bill the State only paid interest on overpayment of income taxes, but that passage of the bill "would set a fair and uniform system for all taxes." [45]

While the letter refers to "all taxes," it is doubtful that Governor Hammond or the legislature meant section .280 to apply to commercial fishing fees. Governor Hammond's letter notes that the new bill required the State to "pay interest ... on overpayments if they are not refunded within 90 days after the overpayment arose." [46] In other words, Governor Hammond's language suggests that subsection (c), which establishes a 90–day interest-free window, is coextensive with subsection (a), which sets the rate of interest. But subsection (c), as described above, is explicitly limited to taxes under Title 43. If the legislature had truly intended section .280(a) to apply to all overpayments, and not merely all taxes levied under Title 43, it would not have been reasonable to have explicitly applied the parallel, limiting provision in .280(c) only to those taxes "imposed by [Title 43]." [47] The class makes no argument to explain why the legislature may have done

**42.** *Gov't Emps. Ins. Co. v. Graham–Gonzalez,* 107 P.3d 279, 284 (Alaska 2005) (quoting *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 788 (Alaska 1996)).

**43.** *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.,* 262 P.3d 593, 597 (Alaska 2011).

**44.** 1976 Senate Journal 45.

**45.** *Id.*

**46.** *Id.*

**47.** AS 43.05.280(c).

this, and we accordingly conclude that it did not.

Further, as Governor Hammond's letter makes clear, the bill that included section .280 was offered largely to bring uniformity to the enforcement provisions of the State tax codes.[48] As part of this goal, section .280, as written at the time of its initial passage, set the interest rate owed by the State for overpayment at eight percent,[49] the same rate then owed to the State for delinquency.[50] It therefore created uniform interest rates for overpayment and underpayment. The current version of section .280 continues this goal, specifically pegging the overpayment rate to the underpayment rate.

But any conclusion that section .280 applies to overpayment of commercial fishing fees runs contrary to this goal. Notably, Title 16 provides that if a fisher is late in paying a fee, the State may charge interest as provided by AS 45.45.010 (currently 10.5% annually).[51] Our holding in *Carlson III* therefore created a system in which the rate of interest owed to the fishers for overpayments of Title 16 fishing fees is substantially higher than the rate of interest owed to the State for underpayments by the fishers.

In *Carlson III*, we focused on the partial structural congruity between Title 43's statute of limitations and Title 43's interest provision. But in doing so, we undermined the goal of uniformity and created a massive incongruity between the interest rate the State owed for overpayment and the interest rate a fisher would owe for underpayment.

It was therefore inconsistent with the legislature's goal of uniformity for us to hold that the State owed the class the high, punitive interest rate of section .280.[52]

Our decision in *Carlson I*, which came more than a decade after the legislature first adopted section .280, held that certain remedial provisions of Title 43 could be applied to an overpayment of fees under Title 16.[53] This does not mean, however, that the governor's earlier reference to section .280 as applying to "all taxes" prospectively brings Title 16 fees under the ambit of section .280.

Nor does an examination of the legislature's purpose in adopting the high, punitive interest rate of section .280 support applying that provision to the fees at issue in this case. In 1991, sections .225 and .280 were amended to establish their current interest rates.[54] In his transmittal letter, Governor Walter Hickel wrote that the current

> interest rate chargeable on certain unpaid and overpaid taxes is a *simple interest* rate of 12 percent. Because the interest is not compounded, taxpayers have an incentive to under-report and prolong disputes over back taxes, since the longer that back taxes remain unpaid, the lower the effective interest rate becomes. As a result, the state ends up loaning billions of dollars to its taxpayers at very low interest rates.[55]

In order to eliminate the incentive for delinquent taxpayers to hold out, the legislature made interest compound. The purpose was to encourage delinquent taxpayers to pay

**48.** 1976 Senate Journal 45.

**49.** Ch. 94, § 1, SLA 1976.

**50.** Ch. 166, § 2, SLA 1976.

**51.** AS 16.43.160(b).

**52.** Although today we do not address our statement in *Carlson I* that AS 43.05.275 set out the statute of limitations for the class's refund claims, *Carlson I*, 798 P.2d 1269, 1280 (Alaska 1990), we recognize that today's holding determining that section .280 does not apply to the class's refund claims calls that statement into question. The State argues that AS 43.05.275 is not a statute of limitations for court actions, but rather sets out procedural time limits for administrative proceedings regarding disputes over Ti-

tle 43 taxes. But revisiting the statute of limitations is not necessary to today's decision because the class first protested the overpayment when it filed this lawsuit, and in *Carlson III* we affirmed December 13, 1984, the date the class was certified, as the date from which fees can be measured. *See Carlson II*, 919 P.2d 1337, 1344 (Alaska 1996) (noting that the class did not satisfy the protest requirement for a tax refund before filing its complaint and remanding to determine whether the complaint met the protest requirement of AS 43.10.210); *Carlson III*, 65 P.3d 851, 871 (Alaska 2003) (concluding that the filing of a complaint satisfied the protest requirement).

**53.** *Carlson I*, 798 P.2d at 1279–80.

**54.** Ch. 23, §§ 2–3, SLA 1991.

**55.** 1991 Senate Journal 405 (emphasis in original).

under protest, rather than refusing to pay at all.

As the State points out, though, with commercial fishing permit fees, a fisher does not have an incentive to withhold payments, as the fees are generally paid in advance and the desire for a permit will be sufficient motivation to pay. The legislative purpose of the high interest rate thus does not support applying it in this case.

Neither legislative intent nor legislative purpose contradicts the unambiguous statutory language limiting AS 43.05.280(a) to taxes levied under Title 43. Section .280 therefore does not apply to overpayment of Title 16 fishing fees. It was clear error for us to hold otherwise in *Carlson III*.

■ We thus turn to the question whether our erroneous prior holding created a "manifest injustice." [56] We conclude that it did. Under our erroneous decision in *Carlson III* the State is liable for an interest payment of more than $62 million, approximately five times the principal amount of refund damages in this case. This overpayment represents a windfall to the class at the State's expense. It is manifestly unjust to require the State to pay this massive punitive interest award when the clear directive of the legislature was to limit the punitive interest rate only to overpayment and underpayment of those taxes levied by Title 43. Thus, the interests of justice compel us to correct our mistake. When, 22 years ago, we made the seemingly uncontroversial assumption that overpaid fishing fees could be refunded through AS 43.10.210, we were deciding only whether the class would be entitled to a refund of overpayments. But following that ruling, we continued down a jurisprudential path that today finds the State liable for more than $60 million in interest under a punitive interest rate statute that did not even exist when we decided *Carlson I*.

The law of the case doctrine guides a court's discretion, but does not serve as an absolute bar to reopening issues. [57] The strong policy reasons for the doctrine include "(1) avoidance of indefinite litigations; (2) consistency of results in [the] same litigation; (3) essential fairness between the parties; and (4) judicial efficiency." [58] In this case, these policy considerations do not weigh strongly against overruling our previous decision. First, there is no reason to suspect our decision today will cause undue delay. Any delay that might have sprung from our reconsideration of issues—including the delay occasioned by our request for supplemental briefing and reargument—has already occurred. Application of a new interest rate now requires only a new set of mathematical calculations, not a new trial. Similarly, because our reconsideration does not create the need for a new trial, concerns of judicial efficiency are only minimally implicated.

As to essential fairness, it is manifestly unfair to require the State to pay a punitive interest award that is erroneous. Although the class may have had a reasonable expectation of receiving prejudgment interest based on our holding in *Carlson III*, the amount of that interest did not become clear until the remand immediately preceding this appeal. Further, as discussed below, the class will still be entitled to an award of prejudgment interest, albeit at a lower rate. And considerations of essential fairness are served by respecting the constitutional separation of powers by protecting the legislature's prerogative to determine when the State owes prejudgment interest.

Finally, we recognize that reconsidering a prior decision undermines the goal of consistency, and we do not do so lightly. But loyalty to consistency alone should not stop us from correcting this major error. We therefore partially overrule our decision in *Carlson III* and hold that the prejudgment

**56.** *Carlson III*, 65 P.3d 851, 859 (Alaska 2003).

**57.** *See, e.g.*, Note, *Successive Appeals and the Law of the Case*, 62 Harv. L. Rev. 286, 287 (1948) ("[T]he doctrine should be treated as a guide to the court's discretion rather than as a limitation on the power of the court.").

**58.** *Beal II*, 209 P.3d 1012, 1017 (Alaska 2009) (quoting *Petrolane, Inc. v. Robles*, 154 P.3d 1014, 1026 (Alaska 2007)).

interest rate provision in AS 43.05.280 does not apply to the class's refund in this case.[59]

### B. The Class Is Entitled To Prejudgment Interest Under The Doctrine Of Assumpsit And AS 09.30.070.

■ The question becomes, then, whether the class is owed any prejudgment interest at all. We conclude that it is at the rate established by AS 09.30.070.

In *State v. Wakefield Fisheries, Inc.*, we concluded that one seeking to recover an overpayment "is [not] limited to recovery according to the statutory provision, AS [43.10.210]. The common law has long recognized a cause of action in assumpsit to recover overpayments of taxes...."[60] We reasoned that "[b]ecause the statutory remedies do not explicitly super[s]ede the common-law remedies ... they are intended as a supplement, and ... the earlier remedy in assumpsit is still available."[61]

In *Principal Mutual Life Insurance Co. v. State, Division of Insurance, Department of Commerce & Economic Development*, we cast doubt on that holding, "question[ing] whether the common law remedy of a cause of action in assumpsit survived the enactment of AS [43.10.210]."[62] We did not, however, overrule *Wakefield Fisheries* on that point. We decline now to decide the question whether the tax refund statute at AS 43.10.210 supersedes the common law cause of action of assumpsit or whether it merely codifies the right to recover on an assumpsit action for wrongfully imposed taxes or fees.[63] But under the unique circumstances before us, we conclude that this particular action should be considered as a common law action in assumpsit.[64] And as the State concedes in its brief, in an action for assumpsit the class is owed prejudgment interest under AS 09.30.070.

■ Assumpsit is a quasi-contract cause of action.[65] Under AS 09.50.250, the State has waived sovereign immunity for actions sounding in quasi-contract.[66] Alaska Statute 09.50.280 provides that for actions brought pursuant to AS 09.50.250, prejudgment interest may be assessed against the State "as provided under AS 09.30.070."[67] The class is therefore entitled to prejudgment interest at a rate provided by AS 09.30.070.

> The action, brought to recover a tax erroneously paid, although an action at law, is equitable in its function. It is the lineal successor of the common count in indebitatus assumpsit for money had and received. Originally an action for the recovery of debt, favored because more convenient and flexible than the common law action of debt, it has been gradually expanded as a medium for recovery upon every form of quasi-contractual obligation in which the duty to pay money is imposed by law, independently of contract, express or implied in fact.
>
> *Stone v. White*, 301 U.S. 532, 534, 57 S.Ct. 851, 81 L.Ed. 1265 (1937).

**59.** We leave the rest of our holdings in *Carlson III* undisturbed.

**60.** 495 P.2d 166, 172 (Alaska 1972), *overruled on other grounds by Principal Mut. Life Ins. Co. v. State, Div. of Ins., Dep't of Commerce & Econ. Dev.*, 780 P.2d 1023, 1030 (Alaska 1989).

**61.** *Id.*

**62.** 780 P.2d at 1030.

**63.** We also need not decide the question whether AS 43.10.210 was correctly applied to the limited entry permit fees involved in this case. Both parties agree that AS 43.10.210 provides the basis for the class's refund in this case. And in its supplemental briefing, the State not only retreated from its position in *Carlson I* that the class was not entitled to a refund but also argued that citizens must have the right to recoup wrongfully imposed taxes and fees (without distinction). We therefore do not need to delve further into the relationship, if any, among limited entry permit fees, assumpsit, and AS 43.10.210.

**64.** The State concedes this point in its brief.

**65.** The United States Supreme Court has described assumpsit as follows:

**66.** AS 09.50.250 provides: "A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in a state court that has jurisdiction over the claim."

**67.** We note that applying this interest rate is more consistent with the legislature's stated intention of bringing uniformity to the enforcement provisions of the State's revenue statutes. Even if the interest rate owed to class members for overpayments occurring on or after August 7, 1997 may be lower than that provided by AS 16.43.160(b), it will nonetheless more closely approximate AS 16.43.160(b)'s effective interest rate than will the compound interest rate required by AS 43.05.280.

## C. The Superior Court Did Not Abuse Its Discretion By Awarding Attorney's Fees Under The Rule 82(b)(1) Schedule For Cases Contested With Trial.

The superior court awarded the class attorney's fees under Alaska Civil Rule 82(b)(1). It found that a three-day trial held in June 2000, the only trial held throughout the history of the case, "constituted sufficient 'trial' to trigger the 'contested with trial' provision." Fees calculated under this Rule were $7,482,569.73.

The State argues that the approximately $7.5 million attorney's fee award was an abuse of discretion because: (1) the superior court should have applied the formula for cases contested without trial; (2) a large fraction of the class did not receive an award and the State prevailed on many issues; and (3) the fee award far exceeded full reasonable attorney's fees. Because our decision today requires a new attorney's fees calculation using the proper rate and amount of prejudgment interest,[68] it is unnecessary to address the last of the State's contentions.[69] We address in turn the State's remaining arguments.

### 1. It was not an abuse of discretion to apply the "contested with trial" formula.

█ The superior court held a three-day non-jury trial in June 2000. The purpose of the trial was to "examine the [S]tate's methodology for implementing the *Carlson II* formula" for calculating the appropriate fee differential between residents and nonresidents.

The State argues that the trial was actually an evidentiary hearing that did not dispose of all the essential facts of the case. It argues that the hearing consequently should not be considered a "trial." The State points

out that we referred to this proceeding as an evidentiary hearing in *Carlson III*.[70]

█ But the trial court has broad discretion and is usually in the best position to determine the nature of the proceeding before it. Moreover, during the proceeding, the State referred to it as a "trial." And even if the proceeding could be characterized as an evidentiary hearing, we have held that evidentiary hearings may be sufficient to trigger a "contested with trial" Rule 82 award.[71] The fact that the trial did not resolve every issue in the case is not determinative. The superior court did not abuse its discretion in finding that the 2000 trial allowed for the award of Rule 82 attorney's fees under the schedule for cases "contested with trial."

The State also argues that the "contested without trial" schedule should be used because the issues determined at trial "could just as easily have been submitted to the court on the written record." Even taking this as true, the superior court did not base its attorney's fee award on what could have happened—it based the award on what actually happened. It was not an abuse of discretion for the superior court to award attorney's fees based on the actual proceedings in the case instead of on what the State now asserts could have happened. Finally, the State argues that the trial lasted "just three days." But "[w]hether the trial lasts two days or twenty, the rule presumes the same award." [72]

### 2. It was not an abuse of discretion to name the class the prevailing party.

█ The State argues that the superior court abused its discretion by failing to adjust the attorney's fee award to reflect the "mixed results achieved by class counsel." It argues that most of the plaintiffs did not

---

68. Civil Rule 82(b)(1) outlines a schedule of attorney's fees as a percentage of the "judgment and, if awarded, prejudgment interest."

69. We note, however, that "[a]ttorney's fees awards made pursuant to the schedule in Civil Rule 82(b)(1) are presumptively correct." *Byars v. Byars*, 945 P.2d 792, 795 (Alaska 1997).

70. *Carlson III*, 65 P.3d 851, 858 (Alaska 2003).

71. *See, e.g., Ward v. Urling*, 167 P.3d 48, 57 (Alaska 2007) (child support case).

72. *Reid v. Williams*, 964 P.2d 453, 461 (Alaska 1998).

prevail in this case because they were excluded from the class and that the State prevailed on a number of key issues, including whether the fishing fees violated the Commerce Clause and calculation of "significant components of the fisheries budget." It also argues that when each party prevails on some issues, the trial court does not have to award fees.

 It is true that the trial court has discretion not to award attorney's fees when "each party prevails on a 'main issue.'"[73] But the superior court did not abuse its discretion here in finding that the class was the prevailing party and was thus entitled to an award of attorney's fees.

 Civil Rule 82 provides that "the prevailing party in a civil case shall be awarded attorney's fees." The prevailing party is "the party who has successfully prosecuted or defended against the action, the one who is successful on the 'main issue' of the action and in whose favor the decision or verdict is rendered and the judgment entered."[74] The class successfully prosecuted the action and was successful in establishing that the State violated the constitutional rights of the class members[75] and that the members are entitled to a refund. The class will receive a substantial judgment. Although some original class members will not receive a refund, the prevailing party here is the class itself, which won a substantial award.

Moreover, the issues that the State prevailed on do not lead to the conclusion that the superior court abused its discretion in not using them to adjust the award. Although in *Carlson II* we agreed with the State that the fee differential should not be analyzed under the Commerce Clause, we did hold that it should instead be analyzed under the Privileges and Immunities Clause.[76] And we later found the differential to be unconstitutional.[77] The main issue here was the unconstitutionality of the fee, and the State lost. Similarly, although in *Carlson III* we agreed with the State on some of its calculations regarding its budget,[78] we still determined that the State owed the class a refund, which was the main issue. The class was clearly the prevailing party, and the superior court did not abuse its discretion by failing to adjust the award based on "mixed results" in this case.

## V. CONCLUSION

We REVERSE our holding in *Carlson III* as to the proper rate of prejudgment interest and REMAND for the superior court to determine a new interest award under AS 09.30.070 and to adjust the attorney's fee award under Rule 82(b)(1) accordingly.

---

**73.** *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 44 (Alaska 1995) (citing *Tobeluk v. Lind*, 589 P.2d 873, 877 (Alaska 1979)).

**74.** *Id.* (internal quotation marks omitted) (citing *Adoption of V.M.C.*, 528 P.2d 788, 795 n. 14 (Alaska 1974)).

**75.** *Carlson IV*, 191 P.3d 137, 145 (Alaska 2008).

**76.** *Carlson II*, 919 P.2d 1337, 1340–41 (Alaska 1996).

**77.** *Carlson IV*, 191 P.3d at 142–44.

**78.** *Carlson III*, 65 P.3d 851, 867 (Alaska 2003).